STATE

v.

Charles SMITH.

No. 99–298–C.A.

Supreme Court of Rhode Island.

Feb. 8, 2001.

Aaron L. Weisman, Providence, for Plaintiff.

Janice M. Weisfeld, Paula Rosin, M. Christine O'Connell, Providence, for Defendant.

Present WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

WEISBERGER, Chief Justice.

This case came before the Court on the appeal of the defendant, Charles Smith (Smith or defendant), from a judgment of conviction entered in the Superior Court in which a jury found him guilty of murder in the first degree, committed by means of torture and aggravated battery. The trial justice denied the defendant's motion for a new trial and sentenced him to a term of life imprisonment without the possibility of parole. The defendant was also sentenced to a consecutive term of fifteen years to serve as an habitual offender. This appeal followed. We affirm the judgment of the Superior Court with regard to the defendant's conviction and sentence to life imprisonment without the possibility of parole. However, the ruling of the trial justice with respect to the defendant's habitual criminal status is reversed, the defendant's habitual criminal sentence is vacated, and the case is remanded to the Superior Court for further proceedings consistent with this opinion. The facts insofar as pertinent to this appeal are as follows.

### Facts and Travel

In April 1997, Margaret Rose Benard (Benard) and defendant lived in an apartment at 41 Park Holm in Newport, Rhode Island, with their three-year-old daughter Samantha Smith (Samantha), and with Benard's two daughters from her prior marriage, Kristen and Toni Jorge (Kristen and Toni), sixteen and fourteen years of age, respectively.

On April 13, 1997, Benard and defendant argued. As a result, Benard requested that defendant leave the apartment and give her the keys, which he did. The following morning, April 14, 1997, at approximately 5 a.m., defendant, wearing a blue one-piece jumpsuit, knocked at the kitchen door and asked Benard for money to purchase cigarettes. Benard gave him two dollars. The defendant then left. After escorting Samantha to her mother's home, Benard returned to the apartment, told Kristen to make sure it was locked up when she and Toni left for school, and then proceeded to work her 6 a.m. to 2 p.m. shift at a nearby Burger King. At approximately 12:55 p.m., Kristen came to the apartment of Karen Lema Carlisle (Carlisle), an apartment adjacent to the Benard–Smith apartment. Kristen told Carlisle that she had skipped school, and asked to come in until such time as she could go home without her truancy being discovered.

At approximately noon, defendant came to the apartment of Leddy Dugan (Leddy), a neighbor of defendant. The defendant then went upstairs to visit with Leddy's brother, Liam Dugan (Liam). At that time, defendant was drinking from a large

plastic bottle, three-quarters full, containing half cranberry juice and half vodka. He told Leddy that he had already consumed a forty-ounce bottle of beer. In Liam's bedroom, defendant complained about Benard and Kristen as he drank vodka and smoked marijuana. At approximately 1 p.m., by which time defendant appeared visibly intoxicated, he stated that he needed to change his clothing at his and Benard's apartment and, because he did not have his key, he asked Leddy and her younger brother, Connor Carr (Connor), if they would call the police if he climbed in the apartment window. When they assured him that they would not, Leddy and Connor watched defendant climb in the kitchen window of his and Benard's apartment. The defendant returned to Leddy's apartment at approximately 1:30 p.m. and spoke briefly with Leddy. He then left. Approximately fifteen minutes later, defendant entered his and Benard's apartment for the second time.

At approximately 1:45 p.m., Kristen left Carlisle's home to return to her own apartment. A few minutes later, Carol Manchester, another neighbor of defendant, saw defendant running out of the driveway of his apartment with a cloth over his right hand. At approximately 2:20 p.m., Benard returned home from work after having picked up Samantha from her mother's home. Upon arriving home, she noticed that a broom was out of place and became concerned that the apartment had been broken into. As Benard began to investigate, she received two telephone calls from defendant, asking her to pick him up at a friend's house. Benard indicated that she would do so, as soon as Toni came home to watch over Samantha. She then continued to check the apartment for signs of an intruder. In the bedroom shared by Kristen and Toni, Benard found blood on a wall and on Kristen's bed. She then discovered Kristen wrapped in a comforter on the floor between the bed and the wall. Benard began screaming and, after hanging up on defendant who was still on the line, she dialed 911 for emergency assistance.

Rescue Lieutenant Robert Sullivan (Rescue Lieutenant Sullivan) of the Newport Fire Department responded to the emergency call. When he arrived at the apartment, he was shown a young female, lying prone, half-concealed under a bed and blankets, surrounded by a large amount of blood. The female, who was later identified as Kristen, was fully clothed except for shoes and socks. She had multiple lacerations to the neck, shoulder, back, and hand. Kristen had no pulse and was not breathing. Rescue Lieutenant Sullivan and his colleagues transported her via ambulance to Newport Hospital. Doctor Richard Altreuter (Dr. Altreuter) attempted to resuscitate Kristen when she arrived at Newport Hospital. He found no pulse and no independent respiration. Doctor Altreuter pronounced Kristen dead at 3:11 p.m.

On April 15, 1997, at approximately 10 a.m., Newport Police Officer Kevin Parsonage arrested defendant as he left the apartment of his sister, Chris Sherman (sister or Sherman). During booking at the police station, Newport Patrolman Richard Gallipeau (Patrolman Gallipeau) seized defendant's clothing and gave defendant a durable paper suit to wear. Detective Gene Bucci (Det. Bucci) interrogated defendant after he had been booked and advised of his *Miranda* rights. After making two telephone calls, defendant agreed to speak with Det. Bucci and gave an oral statement in which he admitted stabbing Kristen and having intercourse with her after she was dead. He told police that after he had entered Benard's apartment through the window, he "took possession of a knife" from the knife holder on the kitchen counter. When Kristen entered the apartment, he hid from her in her room under the bed. Then, after Kristen had left the apartment to take the dog out, defendant tried to leave the apartment but was surprised by Kristen, who had returned through the living room door "and told him that he had no right to be

there and that she was going to call the police." He then grabbed her and "dragged her [from the living room] to her [bed]room [where he] immediately began cutting and stabbing her" with the knife he had secured when he had first entered through the kitchen window. The defendant told Det. Bucci that "he stabbed [Kristen] approximately fifteen times" and, after he thought she was dead, "had sex with her." The defendant also stated that he had buried the knife in a trash barrel and disposed of the jacket he had used to hide the knife in the barrel as well. Before reducing the oral statement to writing, defendant was taken back to Park Holm, wearing the paper suit and shoes, where he pointed out to police the knife and the jacket, which were still in the trash barrel. These items were seized by Patrolman Gallipeau and Det. Bucci.

The defendant was then returned to the station, where a tape recorded statement was taken. The tape recording was then transcribed into a written document, which defendant thereafter signed. The statements related that defendant had gone into the apartment at 41 Park Holm to change his clothing, and while there was surprised by Kristen. The defendant related that he hid from her and then tried to escape the premises while she was out walking the dog. However, Kristen had returned and confronted him before he could get away and had threatened to call the police. At that point, the statement relates, defendant "just bugged out. * * * [J]ust went crazy," and took her to the bedroom and stabbed her with a kitchen knife. The statement also related that defendant "raped her." To accomplish the rape, defendant pulled down her pants and underwear and then "stimulate[d him]self to get an erection" prior to raping her. After raping Kristen, but before fleeing the apartment, defendant wrapped her up in a blanket and pushed her over the side of the bed, and then moved the bed on top of her, all in an attempt to conceal his crimes. The defendant's written statement also revealed that he had no relationship with Kristen, that he did not get along with her, and that he did not like her because she used to tell Benard whenever he would "smok[e] weed, drink[ ] beers[,]" or ask another woman out. When specifically asked why he had stabbed Kristen, defendant replied, "I don't know. She was gonna call the police." The defendant said that enraged him "[c]ause I know I would go to jail."

On September 8, 1997, the state charged defendant, by indictment, with one count of murder and with two counts of first-degree sexual assault upon Kristen. Notice of the state's intent to seek a sentence of life without parole, as well as an habitual offender sentence, was timely filed. A jury trial was held, beginning on January 26 and ending on February 13, 1998.

Deputy Chief Medical Examiner Michael Sikirica, M.D. (Dr. Sikirica), who had performed an autopsy on Kristen the day after the murder, testified at trial. He described the injuries on her body, which included two small puncture wounds in the neck region, eleven stab wounds to the neck and shoulder, twenty incise wounds to the face, ear, neck, and hands, and a vaginal contusion and laceration. Doctor Sikirica opined that the stab, incise, and puncture wounds were consistent with the knife later shown to him by the police. The stab wounds to Kristen's upper body, three of which were fatal, were so penetrating and extensive that Dr. Sikirica testified that they would have required the exertion of a "[m]oderate to severe degree of force" to inflict. Of vital importance to the question of the degree to which Kristen physically suffered as defendant was repeatedly stabbing her to death, Dr. Sikirica testified that, in his expert opinion, Kristen was probably conscious when she suffered two of the three fatal and deeply penetrating stab wounds; that a number of the wounds Kristen suffered to various parts of her hands were inflicted as she attempted to defend herself during defendant's onslaught; and that Kristen was

alive for, at the very minimum, eight minutes (and possibly as long as nineteen minutes) after defendant first began stabbing her. Furthermore, he testified that the vaginal injuries were consistent with a sexual assault. However, Dr. Sikirica was unable to determine whether Kristen was alive or dead at the time of the apparent sexual assault. He ultimately concluded that the cause of death was loss of blood caused by multiple stab wounds.

Robin Smith (Smith), a biochemist and the supervisor of the Forensic Biology Laboratory at the Department of Health, also testified at trial. She testified that she had performed polymerase chain reaction (PCR) DNA analysis on various samples that had been submitted to her. Smith testified that semen retrieved from Kristen's body was consistent with that of defendant and that blood on the jeans seized from defendant and from the jacket, which he had pointed out in the trash to the police, was consistent with that of Kristen.

Paul Ford (Ford), a friend of defendant, testified at trial that he lived in Park Holm and that he regularly socialized with defendant. He stated that he recalled a conversation with defendant, before April 1997, during which he and defendant were drinking beer, when defendant stated that "I'm gonna kill Kristen" by "us[ing] a knife and slic[ing] her throat." Ford did not take the conversation seriously because defendant had earlier been fooling around and because defendant had always been "dopey in the head." Similarly, Angelo Correira (Correira), another friend of defendant, testified to having heard defendant say that "he was mad about [Kristen] telling on him about [his] drinking" and that "he was going to kill her" and that "he'd slice her throat." At the time Correira heard defendant make these statements, he too dismissed them as not being serious.

Finally, defendant's sister testified that she had a conversation with defendant, three days after the murder, about the death of Kristen. She testified that defendant told her that Kristen had surprised him in the apartment and had threatened to call the police. The defendant told his sister that Kristen's threat made him angry and that, as a result, he had pushed her into the bedroom and killed her. According to defendant's sister, defendant recalled wanting to hurt Kristen, but stated that he was "seeing black," did not recall everything, and did not know what he was doing.

At the close of the state's case, on February 11, 1998, the trial justice granted defendant's motion for judgments of acquittal on the charges of sexual assault.[1] On February 13, 1998, the jury returned a verdict of guilty of murder in the first degree and found that the murder had been committed by torture and aggravated battery. The defendant filed a motion for a new trial. The trial justice denied the motion. On April 20, 1998, defendant was sentenced to a term of life imprisonment without the possibility of parole. He was also sentenced to a consecutive term of fifteen years imprisonment to serve as an habitual offender. The defendant filed a notice of appeal.

On appeal, defendant argues that the trial justice erred in admitting into evidence his custodial statements to the police. Additionally, he argues that, because of mitigating factors, a sentence of life without parole was not warranted. Finally, defendant argues that the trial justice erred in imposing an habitual criminal sentence upon him. We shall address each argument in sequence.

## I

## Defendant's Custodial Statements to the Police

■ On appeal, defendant, for the first time, argues that his constitutional right

1. The testimony of Dr. Sikirica, that he was unable to determine whether Kristen Jorge was alive at the time of the apparent sexual assault, was the underlying basis for the trial justice's granting defendant's motion for acquittal on the two counts of sexual assault.

against compelled self-incrimination was violated by the trial justice's erroneous admission of both his oral and written custodial statements into evidence. At trial, the trial justice made a *sua sponte* determination that defendant's statements to the police were "voluntarily given without any force, threats or coercion." The defendant himself never raised the suppression issue (either in writing or orally) at any time during the course of the lower court proceedings.

■■■ "Generally, this [C]ourt will not consider questions that are not properly presented in the court below." *State v. Burke,* 522 A.2d 725, 731 (R.I.1987) (citing *State v. Reis,* 430 A.2d 749 (R.I.1981)). However, notwithstanding a defendant's failure to raise an issue at trial, this Court will review questions concerning basic constitutional rights in very limited circumstances. *See id.* Those circumstances are:

"First, the error complained of must consist of more than harmless error. Second, the record must be sufficient to permit a determination of the issue. * * * Third, counsel's failure to raise the issue at trial must be due to the fact that the issue is based upon a novel rule of law of which counsel could not reasonably have known at the time of trial." *Id.*

In this case, defendant has not met our standard for appellate review. The issue he has raised is not a novel one—that is, whether a confession has been voluntarily made—but one that has been considered in numerous decisions, both federal and state. *See, e.g., Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (involuntary confessions inadmissible); *State v. Pacheco,* 481 A.2d 1009, 1022–27 (R.I.1984) (same); *State v. Lemon,* 478 A.2d 175, 177–78 (R.I.1984) (same); *State v. Amado,* 424 A.2d 1057, 1060–63 (R.I. 1981) (same); *State v. Espinosa,* 109 R.I. 221, 225–31, 283 A.2d 465, 467–70 (1971) (same). In light of these cases, it is clear not only that trial counsel should have reasonably been aware of the legal basis for the constitutional claim, but also that the issue should have been preserved for appeal. However, even if defendant had challenged the admissibility of his statements as given to the Newport police following his arrest, such a challenge would have been wholly without merit.

■■■ Before any interrogation, defendant was orally given his *Miranda* warnings and asked whether he understood them. He was then led unencumbered by handcuffs into an interview room. Upon his entry into the room, Det. Bucci of the Newport police presented defendant with a printed form containing all the *Miranda* warnings. This printed form was introduced as a full exhibit at the trial. The detective reviewed the entire rights form with defendant and requested that he initial each of the admonitions in acknowledgment of his understanding. The defendant placed his initials as requested. He then further acknowledged his understanding of the rights and admonitions contained on the printed form by signing his name at the bottom of the form. He also initialed a further printed line that stated "[t]he police have made no threats or promises to me."

Detective Bucci then asked defendant if he would be willing to answer questions concerning the murder of Kristen Jorge for which he had been arrested. The defendant answered in the affirmative, but requested that he be allowed to use the telephone before any interrogation. Detective Bucci immediately led defendant to a telephone just outside the interview room and allowed him to use the telephone as much as he wanted. The defendant made two telephone calls, which together lasted approximately ten minutes. There were other officers in the room while defendant was making his telephone calls, but no officer was closer than six to eight feet from defendant while he was making the calls.

After the telephone calls were completed, Det. Bucci and Det. Ring led defendant back to the interview room, where he proceeded to give an oral statement after being asked if he was willing to answer questions. Thereafter, defendant was taken to the crime scene, where he led the police to the murder weapon and the jacket that had been used to conceal the knife. Upon his return from the scene of the crime, he executed a written statement setting forth the details of the murder. This statement was also tape-recorded. The written statement, which was transcribed from the tape, again refers to the *Miranda* admonitions that earlier had been given to defendant, and reaffirms his understanding of the rights set forth on the printed form. Each of the fifteen pages of the written statement was signed by defendant and witnessed by Det. Bucci and Det. Ring, as well as a third witness, Robert Silvers.

At no time during the trial did defendant raise any question concerning mental illness or allege or even argue through counsel that he was impaired in any way during his interrogation. Detective Bucci, the only witness to support the admissibility of the confession, testified that defendant appeared "attentive, cooperative, [and] calm" throughout the time that he was being admonished of his *Miranda* rights and when he was asked whether he was willing to answer questions concerning the crime with which he had been charged.

■ On appeal, defendant raises a question concerning the paper suit given to him after his clothing had been removed for examination. This was a durable zippered jumpsuit, according to Det. Bucci, and was not an inappropriate temporary garment under the circumstances. No issue was raised at trial concerning the presence of the police in the room where defendant made his telephone calls. There is no indication on the record that he requested privacy during these calls.

Although defendant never moved to suppress his confessions, the trial justice, out of an abundance of caution, made a mid-trial inquiry into the circumstances and satisfied himself that the Newport police had met every requirement set forth by *Miranda v. Arizona* and its progeny, and had respected all prophylactic rules set forth by the Supreme Court of the United States and by our own cases. Even if defendant's mental or emotional condition had been raised, the complete absence of police coercion, as well as the impeccable conduct of the Newport officers, would have precluded any finding of inadmissibility. *See Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

Accordingly, defendant's oral, written, and taped custodial statements were properly admitted into evidence.

## II

### Validity of the Imposition of the Sentence of Life Imprisonment Without Parole

■ The defendant also argues that a sentence of life imprisonment without the possibility of parole was not warranted in his case. He argues that the trial justice erred in finding that none of the mitigating factors that existed in this case outweighed the aggravating factors that were established by the evidence. The defendant does not argue that the circumstances of the crime were anything other than horrifying and tragic. However, he does argue that because of the mitigating circumstances that existed in this case, this Court should reduce his sentence to one of life imprisonment, with the possibility of parole at some point in the future. The defendant points to an abusive father, an absentee mother, serious and lifelong mental illness, the failure to stay on his antipsychotic medication, and the fact that the murder of Kristen was not "premeditated * * * but instead [the consequence of] a sudden insane rage" as factors that should be weighed in mitigation.

First-degree murder is defined as "murder * * * perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being * * *." G.L.1956 § 11–23–1. The penalty for murder in the first degree is life imprisonment. *See* § 11–23–2. Additionally, "[e]very person guilty of murder in the first degree * * * (4) committed in a manner involving torture or an aggravated battery * * * shall be imprisoned for life and if ordered by the court pursuant to chapter 19.2 of title 12 such person shall not be eligible for parole from imprisonment." Section 11–23–2. General Laws 1956 § 12–19.2–1 provides in pertinent part:

"After hearing evidence and argument relating to the presence or absence of aggravating and mitigating factors, the court shall, *in its discretion*, sentence the defendant to either life imprisonment without parole or life imprisonment." (Emphasis added.)

■ In all cases wherein the trial justice imposes a sentence of life imprisonment without parole, "[t]he defendant shall have the right to appeal [the] sentence * * * to the supreme court of the state * * *. In considering an appeal of such a sentence, the [C]ourt, after review of the transcript of the proceedings below, may, in its discretion, ratify the imposition of the sentence of life imprisonment without parole or may reduce the sentence to life imprisonment." Section 12–19.2–5. In making this determination,

"we have the obligation to examine the record as the trial justice has done and to exercise our independent judgment in respect to the aggravating circumstances found by the jury and adopted by the trial justice and to consider these aggravating circumstances together with any matter in mitigation. We must also consider the personal history, character, record, and propensities of defendant that are relevant to the sentencing determination." *State v. Travis*, 568 A.2d 316, 325 (R.I.1990).

We begin this analysis by examining the findings of the trial justice. After hearing the arguments of counsel, the trial justice made the following statements in imposing the sentence of life imprisonment without parole:

"As to the issue of torture, the evidence clearly shows that Kristen Jorge fought for her life. The wounds to her hands and fingers show this. She was attempting to defend herself during that violent struggle. She had to conclude, upon attack by the defendant, one of superior strength and experience, that she was going to meet death violently by stabbing. We, in retrospect, can only imagine the horror of those last moments of her life and the horror it held for her. If that isn't torture, then I don't know what is. The trial evidence demonstrated the defendant clearly desired and planned to kill Kristen Jorge weeks, if not months, before the event. He bragged about it and he bragged about the manner precisely in which it was going to be done. And on April 14th of 1997, circumstances gave rise to opportunity.

"The evidence in this matter, in addition to the Presentence Report, shows this defendant to be a person interested in indulging himself. He was a person of self-indulgence. On the date of the murder, his only concern was getting high by drinking vodka and smoking pot. His history shows his attraction to other illegal drugs, such as cocaine and LSD. His existence as a person in the community was parasitic. His former wife, Margaret, the mother of the victim, puts it very succinctly in the Presentence Report, 'He paid no bills, food or rent expenses. His money paid for his car, his drinking, and marijuana. He spent all his time getting high on either drugs or alcohol.' In spite of his absorption of both pot and alcohol on the day of the murder, of all those who saw him prior to and after the incident, none indicated he appeared impaired to the extent that he didn't know what he was

doing. In fact, he declared to his neighbors his intention to climb into the window of the apartment where the murder took place, and from which he had been expelled previously by his wife. He negotiated the window with very little difficulty, in fact, none at all, as the evidence shows. The day after the murder, the defendant, Charles Smith, gave a chilling, vivid account of how he accomplished his foul deed of the day before. His confession was cogent, concise and particularized. At no time did Charles Smith demonstrate any mental impairment or deficiency, nor did he indicate that during the course of this trial. There is little question in the mind of this Court that the commission of the murder of Kristen Jorge was one of premeditated and unmitigated violence and brutality.

"As if the slaying of Kristen was not enough, the defendant, knowing she was no longer alive—he stated that in his confession, he stated that to his sister in his statement to the sister—his conclusion was that she was dead. He sexually aroused himself and had intercourse with her lifeless body. This Court finds that disgustingly repressible [ reprehensible ] and is an act worthy only of the predatory vulture who satisfies their needs by feeding on dead flesh. The Court in its scrutiny examined all mitigating factors relating to this defendant and finds none or any combination of those factors which overcome the aggravating circumstances of this murder."

From our examination of the record in this case, we are of the opinion that the evidence overwhelmingly supports the finding that the murder was committed in a manner involving torture and aggravated battery to the victim. Doctor Sikirica's testimony at trial established that it was possible that Kristen was alive and conscious during the infliction of two of the most serious and penetrating wounds inflicted upon her, and that many of the wounds to various parts of her hands were inflicted as Kristen tried vainly to defend herself from defendant. The trial justice himself noted that:

"Kristen Jorge fought for her life. The wounds to her hands and fingers show this. She was attempting to defend herself during that violent struggle. She had to conclude, upon attack by the defendant, one of superior strength and experience, that she was going to meet death violently by stabbing. We, in retrospect, can only imagine the horror of those last moments of her life and the horror it held for her. If that isn't torture, then I don't know what is."

In respect to the finding that the murder was premeditated, the evidence is again overwhelmingly supportive of this finding. From defendant's statements to the police, it is clear that he grabbed the large kitchen knife with which he would butcher Kristen not *when* he saw Kristen in the apartment, but *immediately upon entering the home* through the kitchen window, before Kristen had even entered the apartment. Furthermore, the evidence revealed that defendant specifically hid under *Kristen's* bed when he heard someone entering the apartment, not under any of the other three beds in the apartment. Additionally, he did not kill Kristen upon seeing her in the living room, but rather dragged her from the living room into her bedroom before he began to butcher her. The defendant also did not stop after he had succeeded in murdering Kristen, but raped her and, when he was finished, pulled up her underwear and pants and, ultimately, wrapped her body in a comforter, pushed her wrapped body over the bed, moved the bed on top of her, grabbed his wife's jacket, using it to cover up the knife he had used to kill Kristen as he fled the apartment, and discarded both the knife and the jacket in a trash barrel. Finally, defendant had told at least two individuals, months prior to the murder, that he wanted to slice Kristen's throat.

Furthermore, defendant had a criminal record. In 1987, in Utah, defendant pled

guilty to burglary of a nondwelling and unlawful possession of a firearm. He was subsequently sentenced to serve six months to one year, with five years suspended and eighteen months probation. The defendant later violated the conditions of his probation, which led to the revocation of probation and a sentence to serve the indeterminate terms of incarceration of not more than five years concurrent with one another. The defendant also had a criminal record in Rhode Island, including, in 1993, two one-year suspended sentences and probation for domestic violence and simple assault; similarly, in 1993, one year of probation for resisting arrest; and in 1997, one year of probation for simple assault.

Nothing in the record supports defendant's contention that the horrific crime he committed was "due largely to [his] failure to stay on his antipsychotic medication." The only mention in the record relating to defendant's mental illness and the medication he took for that mental illness is the statement at the life without parole hearing that he had "unfortunately, * * * stopped taking [Hadol] a few months before [the murder]. He complained that the side effects were the reason he did not continue the medication." This one isolated statement does not, by any stretch, support his contention that he raped and murdered Kristen largely because he had failed to stay on his medication. In respect to defendant's unfortunate childhood, that factor alone is insufficient to override all of the other aggravating circumstances present in the instant case.

Accordingly, on this record, we are of the opinion that ample evidence supported the trial justice's conclusion that this defendant should be subjected to the penalty of life imprisonment without parole. In the exercise of our independent judgment, we affirm the imposition of that sentence.

## III

### The Challenge to the Habitual Criminal Sentence

■ Finally, defendant argues that the trial justice erred in imposing an habitual criminal sentence upon him because the predicate sentences for imposition of this sentence had been imposed on the same day. In the instant case, the two felony offenses underlying the habitual criminal sentence were burglary of a nondwelling and unlawful possession of a firearm, two offenses defendant had committed in Utah.[2] The defendant was sentenced to serve six months to one year in prison, with five years suspended, and eighteen months probation.[3] The defendant argues that because the sentences were imposed together on the same date and because he was ordered to serve those two sentences concurrently, they cannot be considered as separate sentences for purposes of the habitual criminals statute.

The habitual criminals statute, G.L.1956 § 12–19–21, provides in pertinent part:

"(a) If any person who has been previously convicted in this or any other state of two or more felony offenses arising from separate and distinct incidents and *sentenced on two or more such occasions* to serve a term in prison shall, after the convictions and sentences, be convicted in this state of any offense punished by imprisonment for

2. In urging the trial justice to enhance defendant's sentence as an habitual criminal, the state also provided the trial justice with evidence of defendant's several Rhode Island convictions (including, in 1984, in Rhode Island, entering a dwelling or building with felonious intent and attempted breaking and entering). However, because the state produced only the face docket sheets of those convictions (rather than certified, authenticated copies of the actual judgments of con-

victions for those offenses), the trial justice refused to consider them as "triggering" convictions under the statute.

3. The defendant later violated the conditions of his probation, which led to the revocation of probation and a sentence to serve the indeterminate terms of incarceration of not more than five years concurrent with one another.

more than one year, such person shall be deemed an 'habitual criminal.' " (Emphasis added.)

■ Our canons of statutory construction are well established. "Generally when a statute expresses a clear and unambiguous meaning, the task of interpretation is at an end and this [C]ourt will apply the plain and ordinary meaning of the words set forth in the statute." *State v. Bryant,* 670 A.2d 776, 779 (R.I.1996). However, when statutory language is ambiguous, "the primary object of the [C]ourt is to ascertain the legislative intention from a consideration of the legislation in its entirety, viewing the language used therein in the light, nature, and purpose of the enactment thereof." *Mason v. Bowerman Bros., Inc.,* 95 R.I. 425, 431, 187 A.2d 772, 776 (1963) (citing *Nolan v. Representative Council of Newport,* 73 R.I. 498, 57 A.2d 730 (1948); *State v. Muldoon,* 67 R.I. 80, 20 A.2d 687 (1941)). "When the meaning of a criminal statute is ambiguous, the policy of lenity in the construction of criminal statutes requires that the less harsh of two possible meanings be adopted." *State v. Anthony,* 422 A.2d 921, 925 (R.I.1980). "[P]enal statutes must be strictly construed in favor of the party upon whom a penalty is to be imposed." *Bryant,* 670 A.2d at 779 (quoting *State v. Calise,* 478 A.2d 198, 200 (R.I.1984); *Eaton v. Sealol, Inc.,* 447 A.2d 1147, 1148 (R.I.1982)).

Here, the statute provides that, in order to come within its purview, a defendant must have been previously convicted of at least two separate felonies and "sentenced on two or more such occasions." Section 12–19–21. The habitual criminals statute does not define "occasions," nor does Rhode Island case law. Black's Law Dictionary 1078 (6th ed.1990) defines "occasion" as "[t]hat which provides an opportunity for the causal agency to act. Meaning not only particular time but carrying idea of opportunity, necessity, or need, or even cause in a limited sense," while Webster's Third New International Dictionary 1560 (1976) defines "occasion" as, among other things, "a particular time at which something takes place: a time marked by some happening." Thus, the word "occasion" itself is susceptible to more than one plain and ordinary meaning; it can refer to one specific point in time, as well as simply opportunity or cause.

■ Given the ambiguity of the word "occasion," this Court must engage in statutory interpretation to determine how it is used in the habitual criminals statute. Reference to the policy underlying habitual offender statutes "reflects the Legislature's determination that a third or subsequent offense is more serious than a first or second offense and accordingly should be punishable as such." *State v. Tregaskis,* 540 A.2d 1022, 1026 (R.I.1988). Such statutes target those individuals who have failed to avail themselves of multiple opportunities to reform themselves following conviction of criminal offenses: "Recidivist statutes are enacted in an effort to deter and punish incorrigible offenders. * * * They are intended to apply to persistent violators who have not responded to the restraining influence of conviction and punishment." *State v. Conley,* 222 N.W.2d 501, 503 (Iowa 1974). In light of the policy underlying habitual criminals statutes and in light of the policy that dictates that lenity must be afforded in the construction of criminal statutes when two or more meanings are possible, this Court today follows those courts that have concluded that the convictions used as a basis for enhanced punishment must occur sequentially. *See, e.g., Ford v. State,* 652 So.2d 1236, 1237 (Fla.Dist.Ct.App.1995) (sequential convictions are necessary for imposition of habitual offender statute); *Miller v. State,* 275 Ind. 454, 417 N.E.2d 339, 342 (1981) (same); *State v. Tillman,* 228 N.W.2d 38, 41 (Iowa 1975) (same); *State v. Wilson,* 6 Kan.App.2d 302, 627 P.2d 1185, 1185 (1981) (same); *Coleman v. Commonwealth,* 276 Ky. 802, 125 S.W.2d 728, 729 (1939) (same); *Montone v. State,* 308 Md. 599, 521 A.2d 720, 724 (1987) (same). However, the state argues that

this Court should affirm the trial justice's imposition of the habitual offender sentence because even though "the reasons given by the trial court [were] erroneous * * * there are other valid reasons to support the * * * judgment appealed from." *Gross v. State Division of Taxation,* 659 A.2d 670, 672 (R.I.1995) (citing *Ambeault v. Burrillville Racing Association,* 118 R.I. 310, 315, 373 A.2d 807, 809 (1977)). The state argues that the trial justice should have taken into account defendant's Rhode Island convictions, which were submitted by the state to the trial justice in the form of docket face sheets, when the trial justice determined whether defendant was an habitual offender. The defendant did not contest the factual existence of those convictions; rather, he objected to the form in which they were introduced. Section 12–19–21(b) explicitly provides that "*authenticated copies of former judgments and commitments* which comprise the two or more prior convictions and imprisonments required under this section shall be *prima facie* evidence of defendant's former convictions and imprisonments." (Emphases added.) The state did not comply with the statutory mandates provided in § 12–19–21(b). The proffered docket face sheets for defendant's Rhode Island convictions clearly were not accompanied by the statutorily required "authenticated copies of former judgments and commitments." Accordingly, we find that no *prima facie* proof was established under the statute. Therefore, we agree with the trial justice that the state's proffer of the docket face sheets of defendant's Rhode Island convictions was insufficient to meet its burden of proof under the statute.

■ We hold that because the state has failed to meet its burden of proof under § 12–19–21(b), the habitual offender sentence must be vacated. The state, however, is not precluded from again seeking a sentence under the habitual criminals statute. *See State v. Clark,* 754 A.2d 73, 83 (R.I.2000) (noting that principles of dou-

ble jeopardy do not apply to enhanced sentencing statute because it does not create a separate offense). Therefore, we remand this issue to the Superior Court to determine whether adequate evidence may be presented to establish the fact that the defendant is an habitual offender.

### Conclusion

For the reasons stated, the defendant's appeal is denied in part and sustained in part. The defendant's conviction of murder in the first degree is affirmed, as is his sentence of life imprisonment without the possibility of parole. However, the ruling of the trial justice with respect to the defendant's habitual criminal status is reversed, the defendant's habitual criminal sentence is vacated, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.