Edward P. REYNOLDS et al.

v.

TOWN OF JAMESTOWN et al.

Holly Swett, Intervenor.

No. 2010–261–Appeal.

Supreme Court of Rhode Island.

June 18, 2012.

Kelly M. Fracassa, Esq., Westerly, for Plaintiffs.

G. Quentin Anthony, Esq., for Defendants.

Present: SUTTELL, C.J.,
GOLDBERG, FLAHERTY, ROBINSON,
and INDEGLIA, JJ.

## OPINION

Justice GOLDBERG, for the Court.

This case came before the Supreme Court on May 2, 2012, after a justice of the Superior Court granted a declaratory judgment in favor of the plaintiffs, Edward P. Reynolds (Reynolds), Nancy E.R. Wharton (Wharton), and Ellen C. Reynolds (Ellen Reynolds) (collectively, plaintiffs). The defendants, Louise Sellon (Sellon), Lisa Barsumian (Barsumian), and Thomas Farrell (Farrell), and the intervenor, Holly Swett (Swett) (collectively, defendants), appealed the trial justice's determination that the 1966 property division that created the disputed lot in this case was proper.[1] On appeal, the defendants contend that the lot resulting from the property division constituted an illegal subdivision because it lacked adequate street access. After careful consideration of the parties' arguments, we affirm the judgment of the Superior Court.

## Facts and Travel

Lot 733 (Lot 733, the Lot, or subject lot) on Assessor's Plat 9 is situated on Narragansett Bay in Jamestown and is owned by plaintiffs.[2] The property was once part of a larger parcel, referred to as "Old Lot 297." By deed dated May 31, 1966, Old Lot 297 was divided into Lot 733 and the current Lot 297, owned by defendants Farrell and Barsumian.[3] Lot 733 is bor-

dered on the east by the bay, on the north by Lot 297, on the south by Lot 300, which is owned by intervenor Swett, and on the west by Lot 299, which is owned by defendant Sellon. Lot 733 is an undeveloped parcel that is situated between the bay and Lot 299, which lot fronts on Walcott Avenue, a public road. The subject lot has no frontage on any road; however, there are two preexisting and contiguous rights-of-way of different widths that provide Lot 733 with access to Walcott Avenue. The first right-of-way is approximately twenty feet wide and 263 feet long and runs along the border between Lots 299 and 300. It begins at Walcott Avenue and leads to the second right-of-way, which is approximately twelve feet wide and sixty-six feet long and connects the first right-of-way to Lot 733. When Lot 733 was conveyed to plaintiffs, the grant included the right to access Walcott Avenue by these rights-of-way; and, when Lots 299 and 300 were transferred to their present owners—defendant, Sellon, and the intervenor, Swett—the conveyances were made subject to plaintiffs' right to use the rights-of-way. Significantly, both rights-of-way existed in 1966 when Lot 733 was created, and they largely were, and remain, unimproved. Notably, in creating Lot 733, no additional new access was necessary.

In 1990, Reynolds first began exploring the possibility of building on Lot 733. In 2003, the zoning enforcement officer for the town, Frederick Brown (Brown), advised that building on Lot 733 would require seeking relief from frontage require-

---

1. We note that the Town of Jamestown (town) originally was a defendant in the case, but did not file an appeal; however, the town did file a counter-statement of the case pursuant to Article I, Rule 12A of the Supreme Court Rules of Appellate Procedure.

2. Reynolds' father purchased Lot 733 in 1976 and both Reynolds' name and his father's

name were on the deed until 2000, when Reynolds' father passed away. Thereafter, Reynolds owned the property with his two sisters, Wharton and Ellen Reynolds.

3. Appended to the Court's opinion is a graphical depiction of the area before and after the land division.

ments.[4] The plaintiffs requested that Brown issue a zoning certificate, but he declined to do so. Brown's refusal was based on his belief that Lot 733 resulted from an illegal subdivision in contravention of the town zoning and subdivision regulations in force in 1966.[5] On July 19, 2004, Brown wrote to plaintiffs explaining that when Lot 733 was created, the town subdivision regulations required that a subdivision of land must provide for a street. Brown concluded that the 1966 subdivision did not conform to the subdivision regulation because the resulting lot "was created without street frontage when the same was required." The plaintiffs appealed Brown's decision to the zoning board, but the board dismissed their appeal.

On March 18, 2005, plaintiffs filed suit in the Superior Court requesting that the zoning board's decision be overturned and that the court declare that Lot 733 was a lawful lot, created in accordance with the regulations in effect in May 1966. The plaintiffs contended that the creation of Lot 733 did not constitute a subdivision as defined in the regulation because "no street was necessary when the lot was divided because the two rights-of-way were already laid out, and legal, valid enforceable means of access to the lot existed as of its division in [19]66." The defendants responded that provision for a street should have been made in 1966 when the Lot was created because the contiguous rights-of-way—amounting to an unimproved private easement—provided insufficient access to allow for the safe passage of emergency vehicles and to promote the welfare of the community.

A two-day bench trial commenced on March 10, 2010, before a justice of the Superior Court. The plaintiffs presented three witnesses. The first was Brown, who testified that he denied plaintiffs' request for a zoning certificate because the lot resulting from the land division had no existing street frontage when it was created, and none was provided for it, making the Lot, in his opinion, an illegal subdivision.

The plaintiffs' next witness was Edward Pimentel (Pimentel), who testified as an expert in zoning and subdivision matters. Pimentel testified that, in his opinion, the two rights-of-way leading from Walcott Avenue to Lot 733 constituted a street, as defined by the Jamestown subdivision regulations in place in 1966. The town's subdivision regulations defined "street" to include a "street, avenue, highway, boulevard, parkway, road, lane, alley and other ways." Pimentel testified that the regulations accorded a "very broad-based definition" to the term "street," such that it would encompass the unimproved rights-of-way that provided access to plaintiffs' property. He further testified that in order for a land division to constitute a subdivision according to the regulations in place at the time, two criteria must be satisfied: (1) land must be in the process of being divided; and (2) the division "would have required the provision for a street." Pimentel testified that the second criterion, which requires provision for a street, is triggered only if "there [is] no

---

4. Frontage is defined as that portion of land that abuts a street or highway or lies between a building's front and a street or highway. Black's Law Dictionary 739 (9th ed.2009).

5. Jamestown regulations in effect in 1966 defined subdivision as: "the division of a lot, tract or parcel of land into two or more lots, sites or other divisions of land in such a manner as to require provision for a street, for the purpose, whether immediate or future, of sale or of building development." The Jamestown subdivision regulation mirrored the state regulations encapsulated in P.L. 1945, ch. 1631, § 1.

actual documented access to the property being divided." Consequently, Pimentel opined that the creation of Lot 733 was not a subdivision because the rights-of-way in existence connected the property to Walcott Avenue, thus eliminating the need to provide for a street.

The plaintiff, Reynolds, testified generally about the nature and use of the two rights-of-way. Reynolds recounted how, as of 1976, the twelve-foot right-of-way consisted of a strip of mowed grass, and that it remained that way until 2008, at which time it was covered with gravel. Reynolds testified that at least twice a year his father would drive over the twelve-foot right-of-way in order to preserve his interest in the easement. As to the twenty-foot right-of-way, Reynolds testified that the only work that had been done to improve that right-of-way was to remove some brush and place some fill in an area. He also testified that prior to 2004, no one representing the town ever had suggested that the 1966 property division was improper.[6]

The defendants presented two witnesses at trial. Howard Tighe (Tighe), the town fire marshal, testified that the fire rescue vehicles in use in 1966 were not designed to be used off-road and that the fire department's current policy is to refrain from driving trucks on dirt or grass roads. Richard Pastore (Pastore), a civil engineer, also testified for defendants. Pastore testified that about five years earlier, he had designed a driveway over the twenty-foot right-of-way and that, prior to that time, the right-of-way was "basically a driveway that had been created as a result of vehicu-

lar traffic." He further testified that the area where the rights-of-way are located has a slope of approximately 7 percent. He stated that vehicular traffic could experience traction problems driving on a slope that steep, especially if the way is unpaved.

On May 7, 2010, the trial justice delivered a bench decision and declared that plaintiffs' Lot did not constitute an illegal subdivision and that the subdivision definition was inapplicable to plaintiffs' Lot.[7] He framed the question before the court as "whether access to the Lot by an unimproved private easement required the provision for a street when the Lot was created in 1966." To resolve that question, the trial justice first addressed defendants' contention that the two rights-of-way did not constitute streets because they were inadequate to promote the welfare of the community and to accommodate the safe passage of rescue vehicles. The defendants' argument primarily rested on this Court's holding in *Sugarman v. Lewis*, 488 A.2d 709, 711, 712 (R.I.1985), in which we declared that the division of a parcel into lots that already had access to a public road was nonetheless a subdivision and required the establishment of a new street "in order to protect the general health, welfare, and safety of the community * * *." The trial justice, however, noted the language in *Sugarman*, which stated that the regulatory requirement for a street functions as a "mechanism to alert the municipality when the proposed development is to be of such dimension as to have a substantial impact on municipal ser-

---

6. At the conclusion of plaintiffs' case, defendants moved for judgment as a matter of law. The trial justice denied defendants' motion and determined that when the evidence was viewed in the light most favorable to plaintiffs, there was sufficient evidence that the

rights-of-way constituted a street as defined by the regulations.

7. By agreement of the parties, plaintiffs' zoning appeal was dismissed, and the only matter before the trial justice was plaintiffs' request for declaratory relief.

vices and the general welfare of the community." The trial justice concluded that the Court's concerns in *Sugarman* were not applicable to Lot 733 because the subdivision of Old Lot 297 created only one additional lot.[8] Conversely, the land division in *Sugarman* consisted of numerous proposed lots and involved an attempt to circumvent the subdivision regulation. Thus, the trial justice found that the case before him was distinguishable from *Sugarman*.

The trial justice then considered defendants' argument that Lot 733 lacked adequate street frontage when it was created in 1966. Significantly, the trial justice found that the ordinances in effect at the time Lot 733 was created did not, by their plain language, require any street frontage. He determined that "the access to the Lot provided by the two rights of way did not require construction of a street or require frontage on a street other than what was provided by the rights of way when this lot was created in 1966." The trial justice decided that the rights-of-way leading from Walcott Avenue to plaintiffs' Lot were "streets" as contemplated by the regulations that were in effect in 1966 and, consequently, that the division of land was proper. The trial justice concluded that because there was an existing street—the rights-of-way—"there is no need for a new street and the definition of subdivision does not apply." The trial justice cautioned, however, that "nothing contained or stated in this decision should be construed or interpreted to mean that this is a 'buildable lot.'" That question, he noted, should be determined in accordance with the usual processes provided for in the municipal ordinances. On May 21, 2010,

final judgment was entered in plaintiffs' favor. The defendants timely appealed.

## Standard of Review

A trial justice has discretion to grant or deny declaratory relief under the Uniform Declaratory Judgments Act, G.L. 1956 chapter 30 of title 9, and his or her decision will not be disturbed absent a clear abuse of discretion or commission of an error of law. *Barrington v. Williams*, 972 A.2d 603, 608 (R.I.2009) (citing *Imperial Casualty and Indemnity Co. v. Bellini*, 888 A.2d 957, 961 (R.I.2005)). "[T]his Court reviews a declaratory judgment to determine 'whether the court abused its discretion, misinterpreted the applicable law, overlooked material facts, or otherwise exceeded its authority.'" *Id.* (quoting *Sullivan v. Chafee*, 703 A.2d 748, 751 (R.I.1997)). Furthermore, "[i]t is well established that the factual findings of a trial justice sitting without a jury are accorded great weight and will not be disturbed unless the record shows that the findings clearly are wrong or the trial justice overlooked or misconceived material evidence." *Fisher v. Applebaum*, 947 A.2d 248, 251 (R.I.2008) (citing *Burke–Tarr Co. v. Ferland Corp.*, 724 A.2d 1014, 1018 (R.I. 1999)). However, we review issues of statutory interpretation *de novo*. *Waterman v. Caprio*, 983 A.2d 841, 844 (R.I.2009).

## Analysis

Based on our review of the record, we affirm the decision, albeit on grounds somewhat different from those relied upon by the trial justice. In so doing, we need not extend our analysis beyond the traditional application of the plain language of the Jamestown subdivision regulation in

---

8. The trial justice additionally noted Brown's testimony that the creation of Lot 733 had no impact on municipal services or the general welfare of the community; and he also noted Tighe's testimony that, although it would be difficult, a fire truck could traverse the rights-of-way.

effect in 1966, which mirrored the language of P.L. 1945, ch. 1631, § 1. *See Murphy v. Zoning Board of Review of South Kingstown,* 959 A.2d 535, 541 (R.I. 2008) (applying the subdivision regulation in effect at the time when lot was created). In 1966, Jamestown's subdivision regulation defined subdivision as: "the division of a lot, tract or parcel of land into two or more lots, sites or other divisions of land in such a manner as to require provision for a street, for the purpose, whether immediate or future, of sale or of building development." When interpreting regulatory language, this Court adheres to the well-settled rule that "[w]hen the language of a statute is clear and unambiguous, [this Court] must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *School Committee of Cranston v. Bergin-Andrews,* 984 A.2d 629, 641 (R.I.2009) (quoting *State v. LaRoche,* 925 A.2d 885, 887 (R.I.2007)); *see Murphy,* 959 A.2d at 541 (stating that this Court employs the same rules of construction when interpreting an ordinance as are applied when interpreting statutes (citing *Ruggiero v. City of Providence,* 893 A.2d 235, 237 (R.I. 2006))).

The language of the Jamestown regulation provides that a subdivision exists when a lot is divided into two or more lots "*in such a manner* as to require provision for a street." (Emphasis added.)

The plain meaning of that regulatory language is that a subdivision exists when a lot is divided in such a way as to necessitate the establishment of a new street. *See Denomme v. Mowry,* 557 A.2d 1229, 1231 (R.I.1989) (interpreting an identical subdivision definition as necessitating the establishment of a new street); *Town of Coventry v. Glickman,* 429 A.2d 440, 443 (R.I.1981) (same). Here, there is no dispute that Lot 733 was created by dividing a single lot into two lots. The question before this Court is whether that was accomplished in such a manner as to necessitate the establishment of a new street.

We are of the opinion that Lot 733 was not divided in such a manner that the provision of a street was required because an independent, preexisting, stand-alone easement afforded access to Lot 733 over the coterminous rights-of-way. Access to the resulting Lot 297 was not dependent on these rights-of-way. At the time when Lot 733 was created, there were separate access routes to Lots 733 and 297 and, consequently, the establishment of a public road or street was not required.[9] Also, Jamestown did not require a minimum amount of road frontage in 1966.[10] Therefore, the creation of Lot 733 did not meet the regulatory definition of a subdivision.[11]

We note that in *Sugarman,* 488 A.2d at 712, this Court held that the creation of numerous parcels of land from a single lot in such a manner that each parcel had at

9. We recognize that this case presents a unique factual situation in which the rights-of-way existed before the Lot was created and access to Lot 733 was not dependent upon traversing through or over new Lot 297 or by deeding an existing means of access.

10. We note that although subsequent town zoning regulations imposed a 150 foot minimum frontage requirement, the record does not reflect that there was a dimensional requirement for road frontage when the Lot was created in 1966. On appeal, defendants

did not press their argument that Lot 733 lacked an adequate minimum amount of frontage when it was created in 1966. Thus, we deem it sufficient that Lot 733 had street access, and we need not inquire as to the dimensional extent of that frontage.

11. In his opening statement before the trial justice, counsel for defendants conceded that a literal interpretation of the regulation means "that if you have a street and you don't need a street for the division of lots, you're exempt from subdivision."

least twenty feet of frontage on an existing town road but resulted in hockey-stick shaped lots was an unlawful attempt to circumvent the subdivision regulations. In *Sugarman,* we declined to apply a literal interpretation of the relevant subdivision regulation because to do so would frustrate the intent of the Legislature. *See id.* at 711, 712. The trial justice in that case had "found as a fact that the plan prepared by [the] plaintiffs was an attempt to circumvent the subdivision requirement and that it was obvious * * * that in order to protect the general health, welfare, and safety of the community, a street was required." *Id.* at 712.

Additionally, in *Sugarman,* 488 A.2d at 712, the proposed development was of such magnitude as to adversely impact the health and welfare of the community and was an attempt to bypass the regulatory process, such that the welfare of the community was jeopardized. In contrast, although not determinative, the trial justice in the case before us found that the creation of Lot 733 had little, if any, impact on the community. We are satisfied that in the unique circumstances of this case, the plain language of the subdivision regulation does not produce a result that is contrary to the intent of the regulation or is so disruptive of the communal welfare as to require us to depart from our well-settled practice of according regulatory language its literal meaning.

Accordingly, we affirm the judgment of the Superior Court, holding that the creation of Lot 733 was not a subdivision. However, we hasten to echo the cautionary statement of the trial justice that "nothing contained or stated in this decision should be construed or interpreted to mean that [Lot 733] is a 'buildable lot' "—resolution of that issue being committed to the processes provided for in the town's local ordinances and state regulations.

### Conclusion

For the aforementioned reasons, this Court affirms the judgment of the Superior Court. The papers in this case may be returned to the Superior Court.