**Supreme Court**

No. 2011-29-C.A.
(P2/10-1280AG)
No. 2010-371-C.A.
(P1/94-3386AG)

State                          :

v.                             :

Adrian Hazard.                 :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2011-29-C.A.
(P2/10-1280AG)
No. 2010-371-C.A.
(P1/94-3386AG)
(Dissent begins on Page 35)

|  |  |  |
|---|---|---|
| State | : | |
| v. | : | |
| Adrian Hazard. | : | |

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**  The defendant, Adrian Hazard,[1] appeals from an adjudication of probation violation.  While on probation, the defendant fled from two uniformed police officers after they instructed him to stop his vehicle.  After the defendant's brief flight came to an end and he was arrested, a replica of an 1858 Remington revolver was discovered on the floor of his car.  On the basis of this conduct, the trial justice found the defendant to be a violator of the terms and conditions of his probation, and the defendant appealed.

In addition to the probation-violation proceeding, the state charged defendant with recklessly operating a motor vehicle, carrying a revolver without a license, and possession of a firearm after having been convicted of a crime of violence.  Apparently concerned about the trial justice's interpretation of G.L. 1956 § 11-47-2(3) and (8) during the course of the violation

---

[1] The defendant's first name is spelled "Adrien" in much of the transcript of the proceedings below.  However, most of the record uses the spelling "Adrian," as does his brief.

hearing, the state requested, in a motion in limine, that the trial justice interpret the Firearms Act (Firearms Act or act), chapter 47 of title 11, in such a manner that a weapon need not be capable of expelling a projectile, or be readily convertible to do so, in order to fit within the definitions of "firearm" or "pistol." The trial justice denied the state's motion and incorporated his earlier ruling from the violation hearing. The state timely appealed.[2] After careful consideration, we affirm the trial justice in all respects.

**Facts and Travel**

On November 8, 1996, defendant pleaded guilty to one count of manslaughter and one count of carrying a pistol without a license. He was sentenced to thirty years for the manslaughter count, with fifteen years to serve and the balance suspended, with probation, and a consecutive ten-year term, suspended, with probation, for the firearms conviction. While on probation after his release from incarceration, defendant was arrested. The circumstances of that arrest follow.

On December 30, 2009, Providence Police Patrolmen Ludwig Castro (Ptlm. Castro) and Eugene Chin (Ptlm. Chin) received information that a gold Volkswagen would be in the area of Linwood Avenue and Cranston Street and that there was a firearm inside the vehicle. Patrolmen Castro and Chin responded to that intersection and soon observed a gold Volkswagen, driven by defendant, turn onto Cranston Street. While the officers followed the vehicle, they observed defendant make a right turn without using a turn signal and then stop in the roadway, obstructing the flow of traffic, while he spoke with a pedestrian. Patrolman Chin activated the overhead lights of his police cruiser, and Ptlm. Castro exited the cruiser and approached the driver's side door of the Volkswagen. Patrolman Castro testified that he did not remove his weapon from its

---

[2] The state's appeal and defendant's appeal have been consolidated.

holster when he approached the Volkswagen. He then instructed defendant to pull the vehicle over; defendant responded by fleeing the scene. Patrolman Castro testified that he and Ptlm. Chin pursued defendant at speeds in excess of forty miles per hour until the Volkswagen was cut off by another police cruiser, bringing the chase to an abrupt end.

Patrolman Castro further testified that, when he approached the vehicle after the stop, he observed the front-seat passenger, Carlos Washington (Washington), hunched over with his hands between his legs. He then spotted the "shiny barrel of a revolver" on the floor of the Volkswagen. Both defendant and Washington were taken into custody, and the officers retrieved a replica of a Remington 1858 .44-caliber black powder revolver from the floor of the vehicle.

The defendant also testified at his probation-violation hearing, offering a different version of the events of December 30, 2009. He testified that he saw a man approach him with a gun drawn and that he "blacked out" and sped off because he was afraid that the man was about to start shooting. He further testified that he did not realize that the man who approached his vehicle was a police officer and that, as soon as he realized that the police were chasing him, he stopped immediately.

Camille Stokes (Stokes), defendant's close friend who said she witnessed these events, testified in support of defendant. She testified that she saw defendant flee after a man wielding a gun approached his car. She related that she followed defendant in her own vehicle and that he stopped as soon as the police activated their overhead lights.

Washington, who is defendant's half-brother,[3] also testified for the defense. He claimed that he owned the revolver and brought it into the Volkswagen on the day that he and defendant were arrested. He further testified that he never informed defendant that he was armed.

---

[3] The record refers to Washington as defendant's brother, step-brother and half-brother. After reviewing the entire record, however, it appears most likely that the two are half-brothers.

Washington testified that, as soon as the police chase began, he threw the gun on the floor of the car because he did not want to be caught with it on his person.

Washington's testimony was in sharp contrast to that of Detective Thomas M. Rawnsley (Det. Rawnsley) of the Youth Services Bureau of the Providence Police Department, who questioned Washington after he was arrested. Detective Rawnsley testified that, while Washington was being questioned, he told Det. Rawnsley that defendant was attempting to flee from the police and that defendant, not Washington, pulled out the gun and threw it on the floor.

The trial justice found that neither Stokes nor Washington was credible. He pointed out inconsistencies within each of their statements and found that each had a strong motivation to lie based on their close relationships with defendant. The trial justice rejected defendant's story about his alleged blackout and credited the testimony of Ptlm. Castro and Chin. He found that the officers' weapons were not drawn when they first approached defendant's vehicle and that defendant deliberately eluded them because he knew the gun was in the vehicle. Based on these findings, the trial justice determined that defendant's actions in eluding the police constituted a failure to keep the peace and remain on good behavior; on that basis, the trial justice determined that defendant had violated the terms of his probation.

The trial justice then went on to address the evidence concerning the weapon that had been found in the car. First, he explained that he was "certain" that Washington had lied when he testified that he brought the gun into the car, describing his testimony as "a perjurious effort to take the onus off his half[-]brother * * *." The trial justice concluded that it was defendant, and not Washington, who possessed the gun. However, because the evidence was clear that the

weapon was damaged and unable to be fired in the condition in which it was found,[4] an issue remained as to whether it constituted a "firearm" or "pistol," as those terms are defined in the Firearms Act. The defendant requested that the trial justice rule that the weapon was an "antique firearm[] unsuitable for use," which would place it outside the ambit of the act. Section 11-47-25.

First, the trial justice found that the gun was not an antique firearm unsuitable for use under § 11-47-25. Next, the trial justice held that possessing a pistol, or the frame or receiver of a gun, did not violate §§ 11-47-5 or 11-47-8 unless the pistol, or the frame or receiver, either had the capability to expel a projectile or might readily be converted to do so. With respect to the subject revolver, the trial justice was satisfied that it could be readily converted to expel a projectile and, therefore, qualified as a "firearm" and a "pistol" under the Firearms Act.[5] Accordingly, the trial justice identified yet another basis on which to rest his probation-violation adjudication: defendant had failed to keep the peace and remain on good behavior because he carried a pistol without a license and possessed a firearm despite being convicted of a crime of violence.

After announcing his conclusion that defendant violated his probation, the trial justice addressed the issue of what portion of defendant's suspended sentence should be executed. The trial justice heard argument from the state, defense counsel, and defendant; he then ordered defendant to serve ten years of the previously imposed suspended sentence.

---

[4] It was undisputed that the revolver was unable to fire because of damage to the nipples at the end of the cylinder, which prevented the nipples from accepting priming or percussion caps.

[5] The trial justice found that the revolver could be made operable by replacing the cylinder. He further observed that a replacement cylinder was inexpensive, costing approximately $80, and readily available via the Internet or from a retailer.

Meanwhile, the state was continuing in its prosecution of defendant on the charges of recklessly operating a motor vehicle, carrying a revolver without a license, and possession of a firearm after having been convicted of a crime of violence. In light of the trial justice's interpretation of the Firearms Act during the course of the probation-violation hearing, the state filed a motion in limine, requesting the court to construe the act such that a weapon need not have the capability to expel a projectile, or be readily convertible to do so, in order to qualify as a "pistol" under § 11-47-2(8). Additionally, the state sought a ruling that a pistol is per se a "firearm" under § 11-47-2(3), and that the mere frame or receiver of a weapon also constitutes a "firearm" under that section, whether or not the pistol, or the frame or receiver, can expel a projectile or be readily converted to do so. The trial justice denied the state's motion, concluding that his interpretation of the statute at the probation-violation hearing was correct.

Both the state and defendant are now before us, each side assigning error to different aspects of the trial justice's rulings in both cases.

**Analysis**

We must decide whether the trial justice erred in (1) finding that defendant violated his probation and (2) his interpretation of the Firearms Act. We first address the state's appeal before tackling the trial justice's probation-violation adjudication.

**I**

**"Firearm"**

In its appeal, the state challenges the trial justice's interpretation of the term "firearm" in § 11-47-2(3). Section 11-47-2(3) provides:

> "'Firearm' includes any machine gun, pistol, rifle, air rifle, air pistol, 'blank gun,' 'BB gun,' or other instrument from which steel or metal projectiles are propelled, or which may readily be converted to expel a projectile, except crossbows, recurve,

- 6 -

> compound, or longbows, and except instruments propelling projectiles which are designed or normally used for a primary purpose other than as a weapon. The frame or receiver of the weapon shall be construed as a firearm under the provisions of this section."

The trial justice held that the phrase "from which steel or metal projectiles are propelled, or which may readily be converted to expel a projectile" applied to all of the instruments listed in § 11-47-2(3), such that a machine gun, pistol, rifle, air rifle, air pistol, blank gun or BB gun must either have the capability to expel a projectile, or be readily convertible to do so, in order to constitute a "firearm." Before this Court, the state asserts that "[t]he sole issue is whether the qualifying phrase, 'from which steel or metal projectiles are propelled, or which may readily be converted to expel a projectile,' refers only to 'other instrument' or refers to all of the weapons identified in the preceding list, including a pistol." (Emphasis added.)

"[W]e review questions of statutory interpretation de novo." Campbell v. State, 56 A.3d 448, 454 (R.I. 2012); see also Reynolds v. Town of Jamestown, 45 A.3d 537, 541 (R.I. 2012). "In matters of statutory interpretation our ultimate goal is to give effect to the purpose of the act as intended by the Legislature." Alessi v. Bowen Court Condominium, 44 A.3d 736, 740 (R.I. 2012) (quoting Webster v. Perrotta, 774 A.2d 68, 75 (R.I. 2001)). "[W]hen the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." Id. (quoting Waterman v. Caprio, 983 A.2d 841, 844 (R.I. 2009)). However, the plain meaning approach must not be confused with "myopic literalism"; even when confronted with a clear and unambiguous statutory provision, "it is entirely proper for us to look to 'the sense and meaning fairly deducible from the context.'" In re Brown, 903 A.2d 147, 150 (R.I. 2006) (quoting In re Estate of Roche, 109 A.2d 655, 659 (N.J. 1954)); see also Mendes v. Factor, 41 A.3d 994, 1002 (R.I. 2012). "Therefore, we must

'consider the entire statute as a whole; individual sections must be considered in the context of the entire statutory scheme, not as if each section were independent of all other sections.'" Mendes, 41 A.3d at 1002 (quoting Generation Realty, LLC v. Catanzaro, 21 A.3d 253, 259 (R.I. 2011)); see also Alessi, 44 A.3d at 742; Jerome v. Probate Court of Barrington, 922 A.2d 119, 123 (R.I. 2007).

However, not all statutory language is created equal; "[a]mbiguity exists * * * when a word or phrase in a statute is susceptible of more than one reasonable meaning." Drs. Pass and Bertherman, Inc. v. Neighborhood Health Plan of Rhode Island, 31 A.3d 1263, 1269 (R.I. 2011). "[W]hen we are confronted with ambiguous language, 'the primary object of the [C]ourt is to ascertain the legislative intention from a consideration of the legislation in its entirety, viewing the language used therein in the light, nature, and purpose of the enactment thereof.'" State v. Clark, 974 A.2d 558, 571 (R.I. 2009) (quoting State v. Smith, 766 A.2d 913, 924 (R.I. 2001)). Additionally, we remain mindful that "[a]mbiguities in penal statutes 'must be strictly construed in favor of the party upon whom a penalty is to be imposed.'" Id. (quoting Smith, 766 A.2d at 924).

In this case, we begin our interpretive task by noting that the text of § 11-47-2(3) does not explicitly answer the question of whether the specifically enumerated instruments must either have the capability to expel a projectile, or be readily convertible to do so, in order to qualify as "firearm[s]" under the Firearms Act. The state relies on the last antecedent rule and contends that the requirement of expelling a projectile or being readily converted to do so applies only to the phrase "other instrument," and not to all of the instruments listed in § 11-47-2(3).

For the reasons discussed below, we reject the state's last-antecedent-rule argument. Although we do not doubt the validity of the last antecedent rule as a viable tool for discerning

the meaning of statutory text, we disagree with the state that the last antecedent rule can alone answer this question of statutory interpretation. There are several reasons for this conclusion, but we note at the outset that the comprehensive history of the Firearms Act is critical to our analysis. As discussed more fully below, when the Firearms Act was first enacted in 1927, there could be little doubt that the act reached only weapons that could fire a bullet. None of the several amendments to the act expressly have abrogated this requirement. What the state's last-antecedent-rule argument boils down to, then, is a plea that we presume that the General Assembly abrogated this requirement by implication arising from the several amendments to the act over the course of several decades. The same can be said for the state's secondary arguments. We reject this plea, however, because "[a]mendments by implication, like repeals by implication, are not favored." United States v. Welden, 377 U.S. 95, 103 n.12 (1964); see also National Association of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 664 n.8 (2007) ("[W]e have repeatedly recognized that implied amendments are no more favored than implied repeals."); Sierra Club v. Secretary of the Army, 820 F.2d 513, 522 (1st Cir. 1987) ("The appellants ask us, in effect, to conclude that the statute was amended by implication. Yet, amendments by implication are disfavored."); cf. Shelter Harbor Fire District v. Vacca, 835 A.2d 446, 449 (R.I. 2003) (after announcing the rule that "repeals by implication are not favored[,]" concluding that a public law enacted in 1951 "did not, as Vacca asserts, 'roll back' any tax exemption that has been granted to Shelter Harbor by virtue of [a public law enacted in 1950]"). Accordingly, as our analysis will demonstrate, the phrase "other instrument" in § 11-47-2(3) truly is the last antecedent—both in sequence and in time—as it was added twenty-three years after the enactment of the Firearms Act.

## A. Last Antecedent Rule

The last antecedent rule "provides that 'referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent.'" State v. Brown, 486 A.2d 595, 600 (R.I. 1985) (quoting 2A C. Sands, Sutherland Statutory Construction, § 47.33 at 245 (4th ed. 1984)). In Brown, we invoked the last antecedent rule to interpret a provision of the Rhode Island Racketeering Influenced and Corrupt Organizations Act, G.L. 1956 chapter 15 of title 7, defining "racketeering activity" as "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, larceny or prostitution, or any dealing in narcotic or dangerous drugs which is [chargeable] as a crime under state law and punishable by imprisonment for more than one (1) year." Id. at 599 (quoting § 7-15-1).[6] The defendant argued that the phrase "which is [chargeable] as a crime under state law and punishable by imprisonment for more than one (1) year" applied to each of the listed offenses. Id. at 600. We disagreed, "conclud[ing] that the clause of § 7-15-1 in issue applies only to its immediate antecedent: 'any dealing in narcotics or dangerous drugs' and not to the other enumerated acts in the statute." Brown, 486 A.2d at 600.

Although we acknowledge that the state's interpretation of § 11-47-2(3) is sensible as a matter of grammar, we are convinced that, in this case, our inquiry cannot stop at simple invocation of the last antecedent rule. The last antecedent rule is not inflexible; while it does create an inference of meaning consistent with sound rules of grammar, it "can assuredly be overcome by other indicia of meaning." United States v. Hayes, 555 U.S. 415, 425 (2009) (quoting Barnhart v. Thomas, 540 U.S. 20, 26 (2003)); see Jama v. Immigration and Customs

---

[6] General Laws 1956 § 7-15-1 was amended after our decision in State v. Brown, 486 A.2d 595, 600 (R.I. 1985), by P.L. 1985, ch. 353, § 1; however, this amendment is irrelevant for present purposes.

Enforcement, 543 U.S. 335, 344 & n.4 (2005) (explaining the possibility that "the inference derived from the last antecedent rule" may be refuted or rebutted); 2A Norman J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction, § 47:33 at 490-91 (7th ed. 2007) ("The rule is another aid to discovery of intent or meaning and is not inflexible and uniformly binding. Where the sense of the entire act requires that a qualifying word or phrase apply to several preceding or even succeeding sections, the word or phrase will not be restricted to its immediate antecedent.").

Even in Brown, the lone decision of this Court invoking the last antecedent rule, we did not rest our interpretation of a statute solely on the last antecedent rule, as the state asks us to do in this case. Rather, we looked to "the intent and purpose of th[e] statute" in order to determine the sense of the words in their proper context. Brown, 486 A.2d at 600 (explaining how the interpretation adopted was "the most sensible interpretation, given the aim of the [statute under examination]" and how that interpretation was required by "the intent and purpose" of the enactment).

In this case, the inference of meaning derived from the last antecedent rule is overcome by three other indicia of meaning. First, the structure of the statute is more consistent with the trial justice's interpretation of the statute—that all instruments listed in § 11-47-2(3) must either have the capability to expel a projectile or be readily convertible to do so—than the state's interpretation. Second, the General Assembly's use of the word "other" in the phrase "other instrument" casts additional doubt on whether the last antecedent rule should be invoked in this case. Finally, the legislative history of the Firearms Act confirms the trial justice's reading.

The United States Supreme Court has made clear that the structure of a statutory provision can "rebut the last antecedent inference." Jama, 543 U.S. at 344 n.4. In Jama, the

Court interpreted a statutory subparagraph where "[e]ach clause [was] distinct and end[ed] with a period, strongly suggesting that each may be understood completely without reading any further." Id. at 344. The Court therefore concluded that the structure of that provision did not "refute the inference derived from the last antecedent rule." Id. However, the Court acknowledged that where "[t]he modifying clause appear[s] not in a structurally discrete statutory provision, but at the end of a single, integrated list—for example, 'receives, possesses, or transports in commerce or affecting commerce'"—the statutory structure could "cut the other way" to "rebut the last antecedent inference." Id. at 344 n.4 (quoting United States v. Bass, 404 U.S. 336, 337, 339 (1971)).

Additionally, in Bass, 404 U.S. at 339, the Court was tasked with determining whether the phrase "in commerce or affecting commerce" in the since-repealed 18 U.S.C. app. § 1202(a) applied only to its immediate antecedent—"transports"—or to the prior antecedents—"receives" and "possesses"—as well.[7] The Court decided that the phrase applied to all three, explaining:

> "While the statute does not read well under either view, 'the natural construction of the language' suggests that the clause 'in commerce or affecting commerce' qualifies all three antecedents in the list. * * * Since 'in commerce or affecting commerce' undeniably applies to at least one antecedent, and since it makes sense with all three, the more plausible construction here is that it in fact applies to all three." Bass, 404 U.S. at 339-40

---

[7] The statutory provision interpreted in United States v. Bass, 404 U.S. 336 (1971), provided, in pertinent part, as follows:

"Any person who—

"(1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony * * * and who receives, possesses, or transports in commerce or affecting commerce * * * any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both." Id. at 337 (quoting 18 U.S.C. app. § 1202(a), repealed by Firearms Owners' Protection Act, Pub. L. No. 99-308, § 104(b), 100 Stat. 449, 459 (1986)).

(quoting <u>Porto Rico Railway, Light & Power Co. v. Mor</u>, 253 U.S. 345, 348 (1920)).

In adopting this interpretation, the Court rejected the Government's last-antecedent argument:

> "The Government, noting that there is no comma after 'transports,' argues that the punctuation indicates a congressional intent to limit the qualifying phrase to the last antecedent. But many leading grammarians, while sometimes noting that commas at the end of series can avoid ambiguity, concede that use of such commas is discretionary. * * * When grammarians are divided, and surely where they are cheerfully tolerant, we will not attach significance to an omitted comma. It is enough to say that the statute's punctuation is fully consistent with the respondent's interpretation, and that in this case grammatical expertise will not help to clarify the statute's meaning." <u>Bass</u>, 404 U.S. at 340 n.6.

In this case, as in <u>Bass</u>, the modifying clause—"from which steel or metal projectiles are propelled, or which may readily be converted to expel a projectile"—appears at the end of a single, integrated list of instruments separated by commas. Because the modifying language "undeniably applies to at least one antecedent, and since it makes sense with all" of the instruments listed in § 11-47-2(3), "the more plausible construction here is that it in fact applies to all" of the listed instruments, and not merely to the last antecedent. <u>Bass</u>, 404 U.S. at 339-40.[8]

---

[8] The dissent takes issue with this conclusion with respect to blank guns: "[b]ecause a blank gun does not (and cannot) expel a projectile and cannot readily be converted to do so, its inclusion within the definition of a firearm undercuts the majority's conclusion that a weapon must meet those requirements to constitute a firearm." We disagree with this assertion. Blank guns can, in some circumstances, readily be converted to expel a projectile. <u>See</u> <u>United States v. Mullins</u>, 446 F.3d 750, 755, 756 (8th Cir. 2006) (holding that there was sufficient evidence that the defendant's .22-caliber starter gun could readily "be converted to expel a projectile, without any specialized knowledge, in less than an hour, and in minutes by an expert"); <u>United States v. 16,179 Molso Italian .22 Caliber Winlee Derringer Convertible Starter Guns</u>, 443 F.2d 463, 464, 465 (2d Cir. 1971) (concluding that .22-caliber starter guns could readily be converted to expel a projectile because they "could be converted to shoot live ammunition within three to twelve minutes").

Moreover, the General Assembly's use of the word "other" in the last antecedent "other instrument" also is telling. If the General Assembly intended to convey that, in order to constitute firearms, the delineated instruments—machine gun, pistol, rifle, air rifle, air pistol, "blank gun," and "BB gun"—need not be capable of firing, or be readily convertible to do so, then the word "other" creates unnecessary dissonance and surplusage in the definition of "firearm." If the word "other" simply was omitted, a "firearm" would include "<u>any</u> machine gun, pistol, rifle, air rifle, air pistol, 'blank gun,' 'BB gun,' or <u>instrument</u> from which steel or metal projectiles are propelled, or which may readily be converted to expel a projectile."

The statute we interpreted in <u>Brown</u> provides another apt illustration. That statute, § 7-15-1, defined "racketeering activity" as "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, larceny <u>or</u> prostitution, <u>or</u> any dealing in narcotic or dangerous drugs which is [chargeable] as a crime under state law and punishable by imprisonment for more than one (1) year." <u>Brown</u>, 486 A.2d at 599 (quoting § 7-15-1) (emphases added). The General Assembly employed the word "or" twice in that definition to isolate the last antecedent from the other previously listed items; the first "or" concluded the list of the initial category of offenses that constituted racketeering activity, without regard to whether those offenses were felonies, and the second "or" created a second category of offenses that constituted racketeering activity, provided that those offenses were felonies. In other words, the statute defined two categories of racketeering activity: "any act or threat involving [(1)] murder, kidnapping, gambling, arson, robbery, bribery, extortion, larceny <u>or</u> prostitution, <u>or</u> [(2)] any dealing in narcotic or dangerous drugs which is [chargeable] as a crime under state law and punishable by imprisonment for more than one (1) year." <u>Id.</u> (quoting § 7-15-1) (emphases

- 14 -

added).  Therefore, invocation of the last antecedent rule was perfectly consistent with the thrust of the statutory language chosen by the General Assembly.

In this case, by contrast, far from clearly separating the last antecedent from the previously listed instruments, the use of the phrase "<u>other</u> instrument" in § 11-47-2(3) references the former antecedents and indicates that the delineated instruments properly are understood as a subset of the "other instrument[s] from which steel or metal projectiles are propelled, or which may readily be converted to expel a projectile * * *."  Section 11-47-2(3); <u>see</u> <u>James v. City of Costa Mesa</u>, 700 F.3d 394, 399 (9th Cir. 2012) ("One would not <u>naturally</u> describe 'the use of a drug taken under supervision by a licensed health care professional, or <u>other</u> uses authorized by the Controlled Substances Act or other provisions of Federal law' unless the supervised uses were a <u>subset</u> of the uses authorized by the CSA and other provisions of federal law.  The plaintiffs' reading thus results not only in surplusage, but also in semantic dissonance." quoting 42 U.S.C. § 12210(d)(1)).

Finally, the legislative history of the Firearms Act further rebuts the inference of meaning created by the last antecedent rule.  In 1927, during the height of Prohibition, the General Assembly entered the fray of weapons regulation and enacted the Firearms Act in order to regulate the possession of firearms.  P.L. 1927, ch. 1052, §§ 1-20.  The term "firearm" was defined to "include any machine gun or pistol."  <u>Id.</u>, § 1.  This first iteration of the Firearms Act also defined "machine gun" and "pistol," and each term clearly contemplated that the instrument be capable of firing.  The act provided that the term "'[m]achine gun' shall include any weapon which <u>shoots</u> automatically and any weapon which <u>shoots</u> more than twelve shots semi-automatically without reloading."  <u>Id.</u> (emphases added).  Although the definition of the term "pistol" did not require explicitly that the instrument be capable of firing, the context makes clear

that, to qualify as a "pistol" in 1927, the weapon needed to have the capability to shoot: "'Pistol' shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall length less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only." Id. (emphasis added). Thus, when the statute was enacted in 1927, there was no hint that the Firearms Act encompassed inoperable instruments.

Time marched on, but the definition of "firearm" remained the same until 1950, when the General Assembly broadened its reach beyond pistols and machine guns. See P.L. 1950, ch. 2452, § 1. The amended definition read as follows: "'Firearm' shall include any machine gun, pistol, rifle, air rifle, air pistol, 'blank gun', 'BB gun', so-called, or other instrument from which steel or metal projectiles are propelled." Id. Notably, the definitions of "machine gun" and "pistol" were not amended at this time. Properly understood, then, the 1950 amendment simply added certain instruments—with which the modifying clause "from which steel or metal projectiles are propelled" undeniably makes sense—along with the last antecedent "other instrument" to the 1927 Firearms Act's definition of "firearm," which included only items that had the capability to expel a projectile.

Since 1950, there have been several additional iterations of the definition of "firearm." In 1959, the General Assembly added an exception carving out "instruments propelling [steel or metal] projectiles which instruments are designed or normally used for a primary purpose other than as a weapon." P.L. 1959, ch. 75, § 1.[9] In 1975, the definition was amended to read:

---

[9] The entire definition of "firearm" under P.L. 1959, ch. 75, § 1 read as follows:

"'Firearm' shall include any machine gun, pistol, rifle, air rifle, air pistol, 'blank gun,' 'BB gun,' so-called, or other instrument from which steel or metal projectiles are propelled, except such instruments propelling such projectiles

- 16 -

"'Firearm' shall include any machine gun, pistol, rifle, air rifle, air pistol, 'blank gun,' 'BB gun,' so-called or other instrument from which steel or metal projectiles are propelled, **or which may readily be converted to expel a projectile**, except such instruments propelling such projectiles which instruments are designed or normally used for a primary purpose other than as a weapon. **The frame or receiver of any such weapon shall be construed as a firearm under the provisions of this section.**" P.L. 1975, ch. 278, § 1.

In 1991, the General Assembly amended the definition once again so that "recurve, compound or longbows" were excluded. P.L. 1991, ch. 333, § 1.[10] Lastly, except for minor stylistic changes, the final amendment to the definition of "firearm" arose during the 2012 legislative session when the General Assembly added "crossbows" to the "recurve, compound, or longbows" exception. P.L. 2012, ch. 232, § 1; P.L. 2012, ch. 213, § 1.[11] There is nothing in these several amendments that suggests that the General Assembly intended to extend the

---

which instruments are designed or normally used for a primary purpose other than as a weapon."

[10] Public Laws 1991, ch. 333, § 1 amended the definition of "firearm" to read as follows:

"'Firearm' shall include any machine gun, pistol, rifle, air rifle, air pistol, 'blank gun,' 'BB gun,' so-called or other instrument from which steel or metal projectiles are propelled, or which may readily be converted to expel a projectile, except recurve, compound or longbows and except such instruments propelling such projectiles which instruments are designed or normally used for a primary purpose other than as a weapon. The frame or receiver of any such weapon shall be construed as a firearm under the provisions of this section."

[11] Public Laws 2012, ch. 232, § 1 and P.L. 2012, ch. 213, § 1 enacted identical amendments to the definition of "firearm," which now reads:

"'Firearm' includes any machine gun, pistol, rifle, air rifle, air pistol, 'blank gun,' 'BB gun,' or other instrument from which steel or metal projectiles are propelled, or which may readily be converted to expel a projectile, except crossbows, recurve, compound, or longbows, and except instruments propelling projectiles which are designed or normally used for a primary purpose other than as a weapon. The frame or receiver of the weapon shall be construed as a firearm under the provisions of this section."

- 17 -

Firearms Act's prohibitions to instruments that can neither fire a bullet nor be readily converted to do so.

The upshot of the act's history is that one hardly can say that the interpretation of § 11-47-2(3) called for by the last antecedent rule, grammatically sound though it may be, is compelled. Rather, this legislative history demonstrates that, when it first enacted the Firearms Act in 1927, the General Assembly intended to regulate the possession and use of dangerous weapons that had the capability to fire a projectile—namely, "pistols" and "machine guns" as those terms were understood in 1927—such that criminals were prohibited from possessing those dangerous instruments. The legislative history from 1927 onward does not suggest an intent to broaden the scope of the Firearms Act to encompass instruments that are incapable of firing or may have been rendered permanently inoperable.[12]

In the last analysis, we are convinced that there are two reasonable interpretations of § 11-47-2(3). Because the interpretation called for by the last antecedent rule is opposed to the

---

[12] The state cites to the decision of the Colorado Court of Appeals in People v. O'Neal, 228 P.3d 211, 213-15 (Colo. App. 2009), a case invoking the last antecedent rule in the context of Colorado's firearms laws, to support its interpretation of the term "firearm" in our Firearms Act. However, O'Neal readily is distinguishable from this case. As the O'Neal Court observed, when the firearms statute under examination in that case was enacted "[i]n 1971, the 'last antecedent' rule of statutory construction was well established in Colorado law." Id. at 215. Therefore, the notion that the Colorado General Assembly was aware of the last antecedent rule and drafted legislation in accordance with it as a means of expressing legislative intent is sound.

Here, by contrast, the legislative history of the Firearms Act, when juxtaposed with this Court's treatment of the last antecedent rule, points to the opposite conclusion. The Firearms Act was enacted in 1927, P.L. 1927, ch. 1052, §§ 1-20, and the first half of the qualifying language—"from which steel or metal projectiles are propelled"—was supplied in 1950. P.L. 1950, ch. 2452, § 1. The General Assembly added the second half of the qualifying language— "or which may readily be converted to expel a projectile"—in 1975. P.L. 1975, ch. 278, § 1. We did not recognize the last antecedent rule as an interpretive tool until 1985. See Brown, 486 A.2d at 600. Therefore, the assumption underlying the last antecedent rule—that a legislature is aware of it and drafts legislation in accordance with it—was much more persuasive in O'Neal than it is here. When coupled with the other reasons why we deem the state's singular reliance on the last antecedent rule misplaced, this distinction convinces us that O'Neal adds little to the analysis under our own Firearms Act.

- 18 -

interpretation called for by the meaning readily deducible from the structure, language and legislative history of the provision, we conclude that the state's last-antecedent-rule argument cannot alone carry the day. Cf. Ex Parte Bollman, 8 U.S. (4 Cranch) 75, 95 (1807) (Marshall, C.J.) ("It has been urged, that in strict grammatical construction, [the qualifying or modifying phrase] refer[s] to the last antecedent, which is, 'all other writs not specially provided for by statute.' This criticism may be correct, and is not entirely without its influence; but the sound construction which the court thinks it safer to adopt, is, that the true sense of the words is to be determined by the nature of the provision, and by the context."). The statute does not clearly answer the question of crucial importance to this case: whether all of the instruments listed must either be capable of expelling a projectile or be readily convertible to do so. Therefore, we conclude that § 11-47-2(3) is ambiguous.

The sections of the Firearms Act under review are penal in nature. Therefore, the rule of lenity compels us to resolve this ambiguity "in favor of the party upon whom a penalty is to be imposed." Clark, 974 A.2d at 571 (quoting Smith, 766 A.2d at 924); see also Smith, 766 A.2d at 924 ("When the meaning of a criminal statute is ambiguous, the policy of lenity in the construction of criminal statutes requires that the less harsh of two possible meanings be adopted." quoting State v. Anthony, 422 A.2d 921, 925 (R.I. 1980)). Application of the rule of lenity in this context necessitates rejection of the state's last-antecedent-rule argument and requires our holding that a "firearm" must either have the capability to expel a projectile or be readily convertible to do so. See Bass, 404 U.S. at 347-48 (invoking the rule of lenity after rejecting the interpretation called for by the last antecedent rule).

The state argues that its interpretation is consistent with the legislative intent behind the Firearms Act. In its brief, the state asserts that "[t]he danger that a pistol poses is not necessarily

conditioned on whether it is operable or may readily be converted to operability. To the contrary, the mere sight or brandishing of a handgun—operable or not— * * * could very easily escalate the risk of deadly violence." This argument is misplaced for several reasons.

For one thing, the notion that the intent behind the Firearms Act was to regulate possession and use of inoperable instruments that could escalate the risk of deadly violence when seen or brandished is belied by both the legislative history of this comprehensive statutory regime and this Court's explanation of the intent behind this enactment: "A careful review of the Firearms Act in its entirety reveals an orderly statutory scheme designed to regulate the possession and use of an array of weapons, including pistols, rifles and other <u>deadly</u> weapons." <u>Mosby v. Devine</u>, 851 A.2d 1031, 1045 (R.I. 2004) (emphasis added). For another thing, even if the General Assembly intended to reach instruments that cannot expel a projectile or be readily converted to do so, it was incumbent upon the General Assembly to express that intent clearly and unambiguously. It did not do so in § 11-47-2(3), and the rule of lenity requires us to resolve the resulting ambiguity in favor of the criminal defendant.

### B. Secondary Arguments

Although the state's primary argument is that the last antecedent rule controls the interpretation of § 11-47-2(3), it offers two secondary arguments to support its position. First, the state argues that, at least with respect to "pistol[s]," the trial justice's interpretation imposes a prerequisite that the General Assembly eschewed in § 11-47-2(8). Second, the state contends that the last sentence of § 11-47-2(3), which provides that "[t]he frame or receiver of the weapon shall be construed as a firearm under the provisions of this section[,]" is inconsistent with the trial justice's interpretation of the first sentence. We address each argument in turn.

- 20 -

In two sentences in its brief, the state asserts that, because the General Assembly eschewed any requirement that a "pistol" be operable or readily convertible to operability in § 11-47-2(8), an interpretation of § 11-47-2(3) requiring all of the delineated instruments to either have the capability to expel a projectile or be readily convertible to do so would render the Firearms Act internally inconsistent. The trial justice disagreed, concluding that a pistol "must be capable of expelling a projectile or be readily able to be converted to expel a projectile." On appeal, the state offers no extended discussion of the interplay between § 11-47-2(3) and (8).

We are in full agreement with the trial justice. Section 11-47-2(8), which defines "pistol," provides that "'[p]istol' includes any pistol or revolver, and any shotgun, rifle, or similar weapon with overall length less than twenty-six inches (26"), but does not include any pistol or revolver designed for the use of blank cartridges only." Nothing in the text of § 11-47-2(8) answers the question of whether a "pistol" must either be capable of firing a projectile or be readily convertible to do so. Rather, we are convinced that the thrust of this section relates to handguns and concealable instruments. The section characterizes the size of the instruments that constitute "pistol[s]" for purposes of the Firearms Act without purporting to modify § 11-47-2(3)'s requirement that "firearm[s]" must either be capable of expelling a projectile or be readily convertible to operability. That portion of § 11-47-2(8) that defines "pistol" to include "any pistol" clearly is of no assistance. However, the dictionary definition of the term "pistol" demonstrates that it is a relatively small, easily concealable firearm, commonly known as a handgun. See The American Heritage Dictionary of the English Language 1343 (5th ed. 2011) (defining "pistol" as "[a] firearm designed to be held and fired with one hand"). Similarly, although the Firearms Act does not define the term "revolver," the dictionary definition of that term reveals that it too is a small, pistol-like weapon. See id. at 1504 (defining "revolver" as "[a]

- 21 -

pistol having a revolving cylinder with several cartridge chambers that may be fired in succession"). Finally, the remaining portion of the Firearms Act's definition of "pistol"—"any shotgun, rifle, or similar weapon with overall length less than twenty-six inches (26")," § 11-47-2(8)—relates solely to the size of the instrument.

After examining § 11-47-2(8) (defining "pistol") in conjunction with § 11-47-2(3) (defining "firearm"), we are of the opinion that the definition of "pistol" contained in § 11-47-2(8) is meant to supplement, and not supplant, the definition of "firearm" in § 11-47-2(3). In other words, for reasons discussed at length, supra, under § 11-47-2(3), all "firearm[s]," including "pistol[s]," must be capable of firing a projectile to fall within the purview of the Firearms Act. A "pistol" under the Firearms Act must either have the capacity to fire a bullet or be readily convertible to do so, although that requirement comes from the inclusion of "pistol" in the definition of "firearm" in § 11-47-2(3), and not from § 11-47-2(8)'s further amplification of the term "pistol." This interpretation is not only the most sensible understanding of § 11-47-2(3) and (8), but also is most consistent with the overarching purpose of the Firearms Act—to regulate the possession and use of deadly weapons. See Mosby, 851 A.2d at 1045 ("A careful review of the Firearms Act in its entirety reveals an orderly statutory scheme designed to regulate the possession and use of an array of weapons, including pistols, rifles and other deadly weapons." (Emphasis added.)). Therefore, the trial justice correctly recognized that "any pistol that cannot expel a projectile or is not readily able to be converted to expel a projectile is not covered under the statute."

We do not suggest that there is no basis for alternative interpretations of § 11-47-2(8). One could argue, as the state appears to, that the text of § 11-47-2(8) alone makes clear that a "pistol" need not be operable or readily convertible to operability in order to qualify as a "pistol"

- 22 -

or "firearm" under the Firearms Act: "'[p]istol' includes <u>any</u> pistol or revolver, and any shotgun, rifle, or similar weapon with overall length less than twenty-six inches (26") * * *," irrespective of capability to fire a bullet. (Emphasis added.) This argument strikes us as overly simplistic. For starters, the first four words of § 11-47-2(8) create uncertainty; "'[p]istol' includes any pistol," but the term is not actually defined. In addition, § 11-47-2(8) also employs the terms "revolver," "shotgun," "rifle" and "similar weapon." None of these terms is defined in the Firearms Act, yet all are similar in one crucial respect: one would normally associate the capability of expelling a projectile with each item. To hold otherwise ignores both the common understanding of the undefined terms "pistol," "revolver," "shotgun" and "rifle" and the fact that § 11-47-2(8) itself makes no attempt to address operability one way or the other. Accordingly, we are of the opinion that § 11-47-2(3) requires that all "firearm[s]," including pistols, either be capable of expelling a projectile or be readily convertible to do so, and that § 11-47-2(8) does not modify this requirement with respect to "pistol[s]."

We note that our interpretation is consistent with this Court's jurisprudence under § 11-47-8(a), which prohibits, <u>inter alia</u>, carrying a pistol or revolver without a license. In <u>State v. Benevides</u>, 425 A.2d 77, 79-80 (R.I. 1981), this Court recognized that operability of the pistol or revolver is an element of a prosecution brought under § 11-47-8(a). In that case, two Cranston police detectives observed the defendant, who was driving a vehicle at the time, hand to a passenger "a dark pipelike object," which the passenger promptly threw out the window. <u>Benevides</u>, 425 A.2d at 79. When the detectives recovered the object, which turned out to be a .22-caliber pistol, it was in multiple pieces. <u>Id.</u> at 78-79. The detectives reassembled the .22 and test-fired it; the weapon "was found to be inoperable because the locking mechanism was broken." <u>Id.</u> at 79. At trial, a detective opined that the pistol was inoperable as a result of being

thrown from a moving vehicle and colliding with a telephone pole, since there were two rounds of ammunition in the pistol's clip and the pistol had a firing pin. Id. The defendant's motion for judgment of acquittal based on "insufficient evidence to establish the element of operability as to the weapon" was denied; after he was convicted of carrying a pistol without a license in a motor vehicle in violation of § 11-47-8(a), he pressed this same argument on appeal. Benevides, 425 A.2d at 78-79.

This Court affirmed and addressed the issue of the quantum of proof necessary to establish the pistol's operability, declaring that the detective's testimony was sufficient to satisfy this element and that it ultimately was a jury question:

> "Detective Sergeant Saccoccia testified that the pistol in his opinion was rendered inoperable upon contact with the telephone pole. His reason for believing that the gun was operable prior to the impact was both reasonable and rational especially in view of the fact that he observed the pistol leave the car in one piece. Furthermore, he testified that the pistol had two live rounds of ammunition in the clip, which fact would likewise support the proposition that the pistol was operable prior to impact. Therefore, we are of the opinion that there were sufficient facts from which a reasonable and rational inference could be drawn that the weapon was operable before it was thrown from the vehicle, especially when such evidence is viewed in the light most favorable to the state. Accordingly, the trial justice committed no error in denying defendant's motion for judgment of acquittal." Benevides, 425 A.2d at 80 (emphasis added).

The above-quoted language demonstrates that operability of the pistol or revolver is an essential element of a prosecution under § 11-47-8(a); if it were not, this Court in Benevides would not have addressed whether sufficient evidence of operability was produced to survive a motion for judgment of acquittal. Although § 11-47-8(a) does not require explicitly that the "pistol or revolver" be operable,[13] the necessity of proving this element implicitly was

---

[13] General Laws 1956 § 11-47-8(a) provides, in pertinent part, that:

- 24 -

recognized in <u>Benevides</u> in accordance with § 11-47-8(a)'s use of the term "pistol," as that term is defined in § 11-47-2(8).

Additionally, in a unique approach to statutory interpretation, the state also assails the trial justice's interpretation of the first sentence of § 11-47-2(3) as inconsistent with the second sentence of that provision, which provides that "[t]he frame or receiver of the weapon shall be construed as a firearm under the provisions of this section." The state argues that "[i]t is incongruous to suggest that the first [sentence] of [§ 11-47-2(3)] requires that a pistol and the other listed weapons be operable or be readily converted to operability when the final sentence states that the frame or receiver of one of those weapons alone qualifies as a firearm."

The state's suggestion that the second sentence of § 11-47-2(3) should control our interpretation of the first sentence strikes us as a backwards approach to statutory interpretation. As discussed above, when the General Assembly enacted the Firearms Act in 1927, there could be little doubt that only instruments that could expel a projectile qualified as "firearm[s]," and the General Assembly's inclusion of the modifying language twenty-three years later did not abrogate this requirement. The "frame or receiver" sentence of § 11-47-2(3) was not added until 1975, nearly fifty years after enactment of the Firearms Act. See P.L. 1975, ch. 278, § 1.

---

"No person shall, without a license or permit issued as provided in §§ 11-47-11, 11-47-12 and 11-47-18, carry a pistol or revolver in any vehicle or conveyance or on or about his or her person whether visible or concealed, except in his or her dwelling house or place of business or on land possessed by him or her or as provided in §§ 11-47-9 and 11-47-10. The provisions of these sections shall not apply to any person who is the holder of a valid license or permit issued by the licensing authority of another state, or territory of the United States, or political subdivision of the state or territory, allowing him or her to carry a pistol or revolver in any vehicle or conveyance or on or about his or her person whether visible or concealed, provided the person is merely transporting the firearm through the state in a vehicle or other conveyance without any intent on the part of the person to detain him or herself or remain within the state of Rhode Island."

Notably, although the General Assembly also added the second half of the modifying language to the first sentence—"or which may readily be converted to expel a projectile"—nothing in that amendment altered the definition of "firearm" contained in the first sentence of § 11-47-2(3) with respect to the requirement that the instrument either be operable or be readily convertible to operability. We therefore reject the state's argument that, because the second sentence contains no explicit requirement that the "frame or receiver" either be operable or be readily convertible to operability to constitute a "firearm," that requirement also does not apply to the items listed in the first sentence. An amendment passed nearly fifty years after the enactment of a statute characterized by patchwork development cannot be read as signaling such a paradigm shift by sheer implication. See National Association of Home Builders, 551 U.S. at 664 n.8; Welden, 377 U.S. at 103 n.12; Sierra Club, 820 F.2d at 522.

### C. Frame or Receiver

We address one additional aspect of the trial justice's interpretation of § 11-47-2(3): his determination that a frame or receiver of a weapon must either be capable of expelling a projectile or be readily convertible to do so in order to qualify as a "firearm." The state argues that the trial justice's interpretation of the second sentence is erroneous because "the plain and unambiguous language of the statute" contains no requirement that a frame or receiver must either have the capability to expel a projectile or be readily convertible to do so. We are unconvinced.

We reject the state's assertion that the "frame or receiver" language set forth in § 11-47-2(3) is clear and unambiguous. Although that sentence may emanate the illusion of clarity at first glance, the state overlooks the use of the phrase "the weapon" in that provision. Under the last sentence of § 11-47-2(3), not every frame or receiver is a firearm; only "[t]he frame or

- 26 -

receiver of the weapon" qualifies as a firearm. Section 11-47-2(3) (emphasis added). The phrase "the weapon" is left undefined by the Firearms Act, but it must have some meaning. See West v. McDonald, 18 A.3d 526, 538 (R.I. 2011) ("When we interpret a statute or ordinance, '[w]e presume that the [Legislature] intended to attach significance to every word, sentence and provision of a statute.'" quoting Retirement Board of the Employees' Retirement System of Rhode Island v. DiPrete, 845 A.2d 270, 279 (R.I. 2004)). The legislative history of the Firearms Act readily demonstrates that the phrase "the weapon" refers to those instruments defined as "firearm[s]" in the first sentence of § 11-47-2(3).

The "frame or receiver" language was first added in 1975 and that sentence then read, "The frame or receiver of any such weapon shall be construed as a firearm under the provisions of this section." P.L. 1975, ch. 278, § 1 (emphasis added). The highlighted language makes clear that "any such weapon" refers to only those instruments constituting "firearm[s]" in the preceding sentence. This language remained in place until the 2000 Reenactment of title 11, when the language slightly was restyled as follows: "The frame or receiver of those weapons shall be construed as a firearm under the provisions of this section." Section 11-47-2(3) (2000) (emphasis added). Under this version, as under the prior language, "those weapons" clearly refers only to those instruments that fall within the definition of "firearms" in the preceding sentence of § 11-47-2(3). The final change to this language appears in the 2002 Reenactment of title 11. The second sentence of that version of § 11-47-2(3) is identical to the current version of that sentence. It reads, "The frame or receiver of the weapon shall be construed as a firearm under the provisions of this section." Section 11-47-2(3) (2002) (emphasis added).

Therefore, the second sentence of § 11-47-2(3) is not the model of clarity that the state suggests; when the meaning of the phrase "the weapon" has been illuminated, the sentence in

- 27 -

effect reads as follows: "The frame or receiver of [any machine gun, pistol, rifle, air rifle, air pistol, 'blank gun,' 'BB gun,' or other instrument from which steel or metal projectiles are propelled, or which may readily be converted to expel a projectile] shall be construed as a firearm under the provisions of this section." Section 11-47-2(3). To say that the language of the second sentence of § 11-47-2(3) does not impose a requirement of operability or ready convertibility to operability ignores that the sentence's scope is constrained by reference back to the preceding sentence, which, for reasons discussed above, imposes such a requirement.

In United States v. Wonschik, 353 F.3d 1192, 1196 (10th Cir. 2004), the Tenth Circuit Court of Appeals interpreted the definition of "machinegun" in 26 U.S.C. § 5845(b). The structure of that definition is very analogous to the structure of the definition of "firearm" under our Firearms Act; 26 U.S.C. § 5845(b) provides:

> "The term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." (Emphasis added.)

The Wonschik Court acknowledged that this definition was not crystal clear:

> "There does appear to be a confusing circularity to the treatment of 'machinegun' in § 5845(b). The statute offers a definition of machinegun as 'any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically,' and then goes on to state that 'the term shall also include' the frame or receiver of a machinegun, parts designed and intended to convert a weapon into a machinegun, and parts from which a machinegun can be assembled. Thus, the statute seems circularly to say that a 'machinegun' is, among other things, a 'receiver of a machinegun' or 'parts that can be made into a

- 28 -

machinegun.'" Wonschik, 353 F.3d at 1197-98 (quoting 26 U.S.C. § 5845(b)).

However, the Tenth Circuit resolved this confusion by reasoning that the phrase "any such weapon" in the second sentence referred back to the primary definition of "machinegun" contained in the first sentence:

> "However, any resulting confusion can be resolved through close attention to the subsection's grammatical structure. Subsection (b), as noted above, provides a primary definition of the term 'machinegun' and then sets apart this primary definition with a period. A new sentence then states that the 'term shall also include' receivers or parts bearing some relation to a 'machinegun.' This structure suggests that, where 'machinegun' or 'such weapon' appears in the second part of the subsection, as an attribute of receivers or parts, the statute implicitly substitutes in the primary definition of 'machinegun' provided in the first sentence. This reading provides a consistent definition for 'machinegun' and 'such weapon' (namely, 'any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger') each time these terms appear within the subsection. Thus, the phrase 'a combination of parts from which a machinegun can be assembled' actually means 'a combination of parts from which [any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger] can be assembled.'" Wonschik, 353 F.3d at 1198 (quoting 26 U.S.C. § 5845(b)).

Returning to our own Firearms Act, we are convinced that, because the second sentence of § 11-47-2(3) contemplates only the frame or receiver of a "machine gun, pistol, rifle, air rifle, air pistol, 'blank gun,' 'BB gun,' or other instrument from which steel or metal projectiles are propelled, or which may readily be converted to expel a projectile," and because those instruments identified in the first sentence of § 11-47-2(3) must either be capable of expelling a projectile or be readily convertible to do so, the trial justice correctly determined that the frame or receiver must either be able to expel a projectile or be readily convertible to do so in order to

qualify as a firearm. If a frame or receiver of an instrument cannot either expel a projectile or be readily converted to operability, then the instrument is not a "firearm" under our Firearms Act, since the instrument would necessarily likewise lack the capacity to expel a projectile or be readily convertible to expel a projectile.[14] Such a frame or receiver would therefore not be "[t]he frame or receiver of the weapon," and it would not constitute a firearm under the second sentence of § 11-47-2(3). (Emphasis added.)

## D. Conclusion

For all of the reasons articulated above, we hold that, in order for an instrument to constitute a "firearm" under § 11-47-2(3) of the Firearms Act, irrespective of whether that instrument is specifically delineated in § 11-47-2(3) or is a mere frame or receiver, the instrument must either have the capability to expel a projectile or be readily convertible to do

---

[14] The dissent asserts that "'frames' and 'receivers' * * *, by definition, are incapable of expelling projectiles." The record in this case is unclear on whether a frame or receiver can itself expel a projectile. The source upon which the dissent relies for its conclusion does not explicitly specify one way or the other whether a "frame" or "receiver" is capable of expelling a projectile. See R.A. Steindler, The Firearms Dictionary 107, 189 (1970) (explaining that, "in usage, [the term 'frame'] has come to mean almost exclusively the forging or casting of a swing-out cylinder revolver[;] [t]he frame consists of the housing for the cylinder, the lockwork, the grip straps, & at its forward end a threaded housing for the barrel" and defining "receiver" as "that part of a rifle or shotgun (excepting hinged frame guns) that houses the bolt, firing pin, mainspring, the trigger group, & the magazine or ammunition feed system").

Even if the dissent is correct that frames and receivers are incapable of firing, this circumstance does not impact our interpretation of the second sentence of § 11-47-2(3). Our interpretation of the term "firearm" makes clear that either the present capability to expel a projectile or the ability to readily be converted to expel a projectile, but not both, is required. Therefore, even if a frame or receiver cannot itself expel a projectile—a determination we cannot make from this record—it still may readily be converted to expel a projectile; indeed, in the typical case, all that will be required to render a frame or receiver capable of firing a bullet is to assemble the necessary internal components. Additionally, even if a frame or receiver lacks present operability, we cannot overlook that the second sentence of § 11-47-2(3) covers only those frames and receivers of "the weapon," which, as we discuss above, refers to those instruments delineated as "firearm[s]" in the first sentence of § 11-47-2(3). That reference back is significant.

so.[15]  Because the trial justice correctly interpreted this provision, we affirm the denial of the state's motion in limine.

## II

## Adjudication of Probation Violation

In the portion of his brief arguing that the probation-violation adjudication should be vacated, defendant relies primarily on his contention that possession of the revolver did not violate the Firearms Act.  At oral argument, defense counsel took a somewhat different tack, vigorously arguing that, if the Firearms Act was not violated, only the allegation of eluding the police would remain, which, by itself, would not warrant a ten-year sentence.  Therefore, counsel requested that we vacate the ten-year sentence imposed by the trial justice and remand the matter with instructions that a lesser sentence be imposed.  We decline counsel's request.

It is well settled that the "sole purpose of a probation violation hearing is for the trial justice to determine whether the conditions of probation"—"[k]eeping the peace and remaining on good behavior"—have been violated.  State v. Gromkiewicz, 43 A.3d 45, 48 (R.I. 2012) (quoting State v. Waite, 813 A.2d 982, 985 (R.I. 2003)).  At such a hearing, proof beyond a reasonable doubt is not required; rather, "the state is only required to prove to the reasonable satisfaction of the hearing justice that the defendant has violated the terms and conditions of the previously imposed probation."  Id. (quoting State v. Anderson, 705 A.2d 996, 997 (R.I. 1997) (mem.)).  "The 'reasonable satisfaction' standard should not be employed to determine the question of defendant's guilt in regard to any offense which may form the basis of the violation

---

[15] Although not necessary to our interpretation of the Firearms Act in this case, we take this opportunity to clarify that the determination of whether a particular instrument is a "firearm" under the act—that is, whether the instrument propels steel or metal projectiles or may readily be converted to expel a projectile—is for the fact-finder.

allegation, but should instead be applied to determine whether defendant maintained or violated the conditions of his probation." Id.; see also Waite, 813 A.2d at 985.

Our review of a trial justice's adjudication of probation violation "is restricted to considering 'whether the hearing justice acted arbitrarily or capriciously in finding a violation.'" Gromkiewicz, 43 A.3d at 48 (quoting State v. Seamans, 935 A.2d 618, 621 (R.I. 2007)). In conducting this task, we remain mindful that "[a]ssessing the credibility of a witness in a probation violation hearing is a function of the hearing justice, not this Court." Id. at 49 (quoting Waite, 813 A.2d at 985).

Before this Court, defendant contends that the revolver qualifies as an "[a]ntique firearm" under § 11-47-25 and therefore falls outside the proscriptions of the Firearms Act.[16] We reject this contention. To be sure, when it defined "[a]ntique firearm[s]," the General Assembly specifically incorporated the definition that is codified in federal law. Section 11-47-2(1) ("'Antique firearm' is defined as that term is defined under the provisions of 18 U.S.C. § 921.").[17] It is undisputed that the revolver found in defendant's possession qualifies as an "[a]ntique firearm" under that definition. This circumstance does not, however, end the analysis.

---

[16] The state claims that this issue is waived because it was not raised at the close of evidence during the violation hearing. However, it was raised at the beginning of the hearing, and the trial justice did in fact rule on it. Therefore, we conclude that the issue was preserved.

[17] Under federal law, the term "antique firearm" is defined as:

"(A) any firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898; or

"(B) any replica of any firearm described in subparagraph (A) if such replica–

"(i) is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition, or

- 32 -

The General Assembly did not exempt all "antique firearms" from the Firearms Act's reach; only "antique firearms unsuitable for use" are exempted. Section 11-47-25 (emphasis added).[18] The state argues that, under Rhode Island law, in order to be accommodated within the antique-firearms exemption, the firearm must not only meet the federal definition, but it also must be "unsuitable for use." Section 11-47-25. The trial justice agreed with this position, and so do we.

The trial justice found that, because the damaged cylinder on the revolver could be replaced in a matter of minutes without difficulty, defendant's revolver was indeed suitable for use and, therefore, did not qualify for the exemption for antique firearms. There is ample evidence in the record supporting this conclusion. Robert A. Hathaway (Hathaway), a seasoned firearms expert, and Stephen Springer (Springer), a criminal investigator for the Attorney General and a former Providence police officer, both testified as to the ease with which a working cylinder could be inserted into the revolver to make it operable and therefore suitable for use. Additionally, a video, which was only about one minute in length, was played in open

---

"(ii) uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade; or

"(C) any muzzle loading rifle, muzzle loading shotgun, or muzzle loading pistol, which is designed to use black powder, or a black powder substitute, and which cannot use fixed ammunition. For purposes of this subparagraph, the term 'antique firearm' shall not include any weapon which incorporates a firearm frame or receiver, any firearm which is converted into a muzzle loading weapon, or any muzzle loading weapon which can be readily converted to fire fixed ammunition by replacing the barrel, bolt, breechblock, or any combination thereof." 18 U.S.C. § 921(a)(16).

[18] Section 11-47-25 provides that "[t]his chapter shall not apply to antique firearms unsuitable for use, nor to collections of firearms utilized and maintained for educational, scientific, or any similar purpose without intent to use the firearms."

court; it showed Springer replacing the cylinder within that short amount of time. Furthermore, Hathaway and Springer testified that a replacement cylinder was easily obtainable via the Internet or from a retailer for approximately $80. Therefore, there is sufficient evidence demonstrating that the revolver recovered from the floor of defendant's vehicle was suitable for use. We therefore see no error in the trial justice's ruling that the revolver did not fit within the antique-firearms exemption to the Firearms Act. For the same reasons, the record provides ample support for the trial justice's conclusion that the revolver could be readily converted to expel a projectile and thus qualified as a "firearm" and a "pistol" under the act.

Additionally, the trial justice determined that it was defendant who was in possession of the revolver. This conclusion was based on his finding that Washington lied about bringing the gun into the car in an effort to protect his half-brother. First, the trial justice found Washington's testimony to be wholly inconsistent with his prior statements to Det. Rawnsley. Second, he rejected Washington's story that he purchased the revolver on a dark night from an unknown person. Ultimately, the trial justice found that defendant, and not Washington, possessed the revolver. Therefore, the trial justice's determination that defendant violated the conditions of his probation by carrying a revolver without a license and possessing a firearm despite a previous felony conviction was neither arbitrary nor capricious.

We note that the trial justice's alternative basis for adjudicating defendant a probation violator also is unassailable. The trial justice weighed the credibility of the witnesses and credited the testimony of Det. Rawnsley and Ptlm. Castro and Chin. He found that Ptlm. Castro did not have his weapon drawn when he first approached defendant's car. He further found the testimony of defendant, Stokes and Washington to be inconsistent and untruthful. The trial justice rejected defendant's story that he "blacked out" before speeding away from the officers

- 34 -

because defendant clearly recalled fumbling with his cell phone at the same time. The trial justice ultimately found that defendant knew that he was being stopped by uniformed police officers and that he deliberately attempted to evade them because he knew that there was a gun in the car. In his bench decision, the trial justice concluded that the act of eluding the police, in and of itself, was a sufficient ground for a finding that defendant violated the terms and conditions of his probation. This conclusion was neither arbitrary nor capricious.

Based on the trial justice's credibility determinations, and a thorough review of the record, we discern no error in the trial justice's finding that the defendant had failed to keep the peace and remain on good behavior and, thus, had violated the terms of his probation. Furthermore, in light of the totality of the circumstances, including the fact that the defendant was on probation for a homicide, it is our opinion that it was within the discretion of the trial justice to sentence him as he did. See State v. Roberts, 59 A.3d 693, 697 (R.I. 2013) ("[T]he [trial justice] has wide discretion when determining the proper sentence to exact upon a probation violator[.]" quoting State v. Lancellotta, 35 A.3d 863, 869 (R.I. 2012)).

## Conclusion

For the reasons articulated above, we affirm the trial justice's adjudication of probation violation and his denial of the state's motion in limine. The papers may be remanded to the Superior Court.


**Flaherty, J., and Indeglia, J., concurring in part and dissenting in part.** Although we agree that the defendant's adjudication of probation violation should be affirmed, we respectfully dissent from the majority's analysis and interpretation of the Firearms Act, G.L. 1956 chapter 47 of title 11 (the Firearms Act or act). Specifically, in our opinion, § 11-47-2(3) (defining

- 35 -

"firearm") is unambiguous and does not require that the specifically enumerated weapons—as well as the frame or receiver of those weapons—have the capability of expelling a projectile, or be readily converted to do so, in order to constitute a firearm.

Section 11-47-2(3) defines the following weapons as firearms: "any machine gun, pistol, rifle, air rifle, air pistol, 'blank gun,' 'BB gun,' or other instrument from which steel or metal projectiles are propelled, or which may readily be converted to expel a projectile * * *." The majority concludes that, if the General Assembly had intended to include within the definition of a firearm weapons that cannot expel a projectile or be readily converted to do so, it did not express that intent clearly and unambiguously, and therefore, the rule of lenity must be applied. We disagree. Although we concede that this statute is not a model of artful draftsmanship, we conclude that § 11-47-2(3) unambiguously indicates that the modifying phrase "from which steel or metal projectiles are propelled, or which may readily be converted to expel a projectile" applies only to the term "other instrument" and not to its counterparts enumerated in the act. Below, we explain our rationale in reaching this conclusion.

I

**The Legislative History**

The majority correctly points out that in 1927, when the General Assembly enacted the Firearms Act, it defined a firearm as "any machine gun" (any weapon which shoots automatically) "or pistol" (which excluded those weapons designed for the use of blank cartridges only). P.L. 1927, ch. 1052, § 1. However, in 1950, the General Assembly then amended the Firearms Act to explicitly include blank guns—which are per se incapable of expelling projectiles—within the definition of "firearm." P.L. 1950, ch. 2452, § 1; see R.A. Steindler, The Firearms Dictionary 55 (1970) (explaining that blank guns expel blank cartridges,

which "contain[ ] a special propellant powder, but no bullet"). Because a blank gun does not (and cannot) expel a projectile and cannot readily be converted to do so, its inclusion within the definition of a firearm undercuts the majority's conclusion that a weapon must meet those requirements to constitute a firearm.

We disagree with the majority's contention that "[b]lank guns can, in some circumstances, readily be converted to expel a projectile." First, the cases that the majority cites to support their assertion deal with starter guns, and the majority assumes that a starter gun is identical to a blank gun. Even if we ignore this inconsistency, we do not believe that there are any circumstances in which a blank gun could readily be converted to fire a projectile. See State v. Waugh, No. 35362, 1977 WL 201120 at *2 (Ohio Ct. App. Jan. 6, 1977) (where a statute defined the term "firearm" as "any deadly weapon capable of expelling or propelling one or more projectiles * * * and any firearm which is inoperable but which can readily be rendered operable, Ohio Rev. Code Ann. § 2923.11(B) (LexisNexis 1975), the court held that "[c]learly, a 'blank gun' is not a 'firearm' under the above statutory definition").

Likewise, in another amendment, in 1975, the General Assembly also added the terms "frame[s]" and "receiver[s]"—items that, by definition, are incapable of expelling projectiles—to the definition of a firearm. P.L. 1975, ch. 278, § 1. Indeed, a frame or receiver is the mere skeleton of a weapon, to which all the other parts attach. See The Firearms Dictionary at 107-08, 189. Thus, although initially the embrace of the Firearms Act included only those weapons which were deemed operable, the succeeding amendments to that act reveal that the General Assembly no longer intended to include a weapon's capability of expelling a projectile or its readiness to do so as a prerequisite to constitute a firearm. Moreover, those amendments belie the majority's assertion that "[t]he legislative history from 1927 onward does not suggest an

intent to broaden the scope of the Firearms Act to encompass instruments that are incapable of firing or may have been rendered permanently inoperable." Instead, although the Firearms Act as initially drafted in 1927 included only those weapons which were deemed operable, the succeeding amendments to that act reveal that the enumerated weapons need not be capable of expelling a projectile to constitute a firearm.

We believe that this reading of § 11-47-2(3) is more harmonious with the design of the Firearms Act as a whole as well as its purpose and underlying policy. See Ryan v. City of Providence, 11 A.3d 68, 71 (R.I. 2011) (It is crucial to statutory interpretation that we "consider the entire statute as a whole; individual sections must be considered in the context of the entire statutory scheme, not as if each section were independent of all other sections." quoting Sorenson v. Colibri Corp., 650 A.2d 125, 128 (R.I. 1994)). Indeed, the Firearms Act distinguishes the definition and use of a "firearm," which includes both operable and inoperable weapons, from the definition and use of a "pistol," which includes operable weapons and specifically excludes inoperable weapons. See § 11-47-2(3), (8). The more-expansive term, "firearm," is then used to restrict possession of both operable and inoperable weapons by fugitives and those who have been convicted of crimes of violence, while the narrower term, "pistol," is used to restrict possession of operable weapons by individual members of the general public without a proper license. See §§ 11-47-5, 11-47-8(a).

This distinction reflects a reasoned policy of keeping firearms out of the hands of felons and fugitives, whether or not those weapons are capable of expelling a projectile.[19] Indeed, the

---

[19] This policy is further reflected in G.L. 1956 § 11-47-6, which prohibits "[m]ental incompetents, drug addicts, and drunkards" from the possession of a firearm, and in § 11-47-7, which prohibits "unnaturalized foreign born person[s] who entered the United States in violation of the laws of the United States or, having legally entered the United States in a lawful manner,

- 38 -

brandishing of a blank gun or the display of a frame or receiver is indistinguishable from that of a gun that expels bullets. By way of example, one can envision the scene of a robbery: someone brandishes a blank gun, demanding money. The person on the other end of that gun is hardly in a position to ask the aggressor or to independently discern whether that weapon is able to expel bullets. The risk of deadly violence is the same whether or not the gun shoots bullets or blanks—the victim could, in turn, fire a gun in self-defense, or a third party could intervene. Either way, the brandishing of a blank gun or the display of a frame or receiver can cause just as much societal harm as that of a gun that expels bullets.

In light of the fact that "[t]he [General Assembly] is presumed to have intended each word or provision of a statute to express a significant meaning, and the [C]ourt will give effect to every word, clause, or sentence, whenever possible," Swain v. Estate of Tyre, 57 A.3d 283, 288 (R.I. 2012) (quoting State v. Clark, 974 A.2d 558, 571 (R.I. 2009)), we cannot ignore its decision to include the term "blank gun" and the term "frame or receiver" within the definition of firearm. This inclusion clearly shows that the General Assembly did not intend that a weapon be operable in order to constitute a firearm.

## II

### The Rule of Last Antecedent

Although we believe that the Firearms Act is unambiguous, and that we, therefore, need not look beyond its plain language, our conclusion is further supported by the doctrine of construction known as the rule of last antecedent. That canon "provides that 'referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent. * * * Thus, a proviso is usually construed to apply to the provision or clause

---

but now remain[ ] in the United States in violation of the laws of the United States * * *," from the possession of a firearm.

- 39 -

immediately preceding it.'" State v. Brown, 486 A.2d 595, 600 (R.I. 1985) (quoting 2A C. Sands, Sutherland Statutory Construction, § 47.33 at 245 (4th ed. 1984)); see also Barnhart v. Thomas, 540 U.S. 20, 26 (2003) ("[A] limiting clause or phrase * * * should ordinarily be read as modifying only the noun or phrase that it immediately follows * * *."); People v. O'Neal, 228 P.3d 211, 215 (Colo. App. 2009), cert. denied, 2010 WL 1436208 (Colo. Apr. 12, 2010) (en banc). Indeed, the majority readily concedes that the rule of last antecedent "create[s] an inference of meaning consistent with sound rules of grammar."

Recently, in O'Neal, 228 P.3d at 215, the Colorado Court of Appeals employed the rule of last antecedent when construing a similar firearms statute that was applied to similar facts.[20] In that case, the defendant, a previous offender, was found guilty of possession of a firearm. Id. at 212. The gun in question, which appeared to have been run over by a car, lacked grips, had an inoperative firing pin, had a misplaced trigger bar, and had a crack in the base of the handle that prevented it from being loaded. In defining the term "firearm," the Colorado statute enumerated a list of weapons, similar to that provided in § 11-47-2(3), followed by the modifying phrase "capable or intended to be capable of discharging bullets, cartridges, or other explosive charges." Colo. Rev. Stat. Ann. § 18-1-901(3)(h) (West 2004). In construing the statute, guided by the rule of last antecedent, the O'Neal court held that the modifying phrase applied only to the last item enumerated in the statute ("other instrument or device") and not to any of the previously enumerated items within that statute. O'Neal, 228 P.3d at 213-14. Therefore, the court concluded that a gun deemed incapable of discharging bullets, cartridges, or other explosive charges constituted a firearm as prescribed under the statute. Id.

---

[20] The Colorado statute provides that "'[f]irearm' means any handgun, automatic, revolver, pistol, rifle, shotgun, or other instrument or device capable or intended to be capable of discharging bullets, cartridges, or other explosive charges." Colo. Rev. Stat. Ann. § 18-1-901(3)(h) (West 2004).

Likewise, it is our opinion that the qualifying language in our own statute ("from which steel or metal projectiles are propelled, or which may readily be converted to expel a projectile") applies only to the last item enumerated ("other instrument"). <u>See</u> § 11-47-2(3). Thus, as the rule of last antecedent explains, any of the preceding items delineated in that statute are firearms notwithstanding their ability to propel projectiles.

## III

### Conclusion

For the foregoing reasons, we respectfully dissent from the majority's decision affirming the trial justice's order denying the state's motion <u>in</u> <u>limine</u>. However, we concur with the majority's decision affirming the adjudication of probation violation.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**          State v. Adrian Hazard.

**CASE NO:**          No. 2011-29-C.A.
                                  (P2/10-1280AG)
                                  No. 2010-371-C.A.
                                  (P1/94-3386AG)

**COURT:**          Supreme Court

**DATE OPINION FILED:**    June 19, 2013

**JUSTICES:**          Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**          Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

                                  Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

                                  For State:  Christopher R. Bush
                                         Department of Attorney General

                                  For Defendant:  John F. Cicilline, Esq.